# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

COMMUNITY LEGAL AID SOCIETY, INC.,
100 W. 10th Street, Suite 801
Wilmington, DE 19801,

                    Plaintiff,

      v.

ADULT AND PRISON EDUCATION
RESOURCES WORKGROUP,
35 Commerce Way, Suite 1
Dover, DE 19904,

MAUREEN FORDE-WHELAN in her official
capacity as Director of the Adult and Prison
Education Resources Workgroup,
35 Commerce Way, Suite 1
Dover, DE 19904,

DELAWARE DEPARTMENT OF
EDUCATION,
401 Federal Street, Suite 2
Dover, DE 19901-3639,

MARK A. HOLODICK, in his official capacity
as the Secretary of Education,
401 Federal Street, Suite 2
Dover, DE 19901-3639,

DELAWARE DEPARTMENT OF
CORRECTION,
245 McKee Road
Dover, DE 19904,

TERRA TAYLOR, in her official capacity as
the Commissioner of the Delaware Department
of Correction,
245 McKee Road
Dover, DE 19904,

                    Defendants.

Civil Action No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**I**

**INTRODUCTION**

1.    The United States and Delaware have enacted various laws to ensure that students with disabilities receive an appropriate education.  Those rights, with minor exceptions, apply to students involved in the criminal justice system.  The United States and Delaware have mandated the continued provision of special education and related services to eligible students with disabilities in correctional facilities.

2.    The Delaware agencies responsible for fulfilling those important obligations and ensuring that they are fulfilled have systemically failed to do so.  The agencies have known of their failures for years.   The United States Department of Education, Delaware Department of Education's appointed Special Education Due Process Hearing Panels, and Delaware Department of Education's own State Complaint investigators have described these failures.   Delaware Department of Education staff have testified to their practices that do not comport with federal or Delaware law.  But the violations of federal and Delaware law have continued.

3.    These violations effectively deprive students with disabilities who are detained (those who have not yet been adjudicated), and students with disabilities who are sentenced, of any meaningful education, let alone the appropriate education to which they are entitled.  Students with disabilities are eligible for special education and related services only until the end of the school year in which they reach age 22.  Yet the Delaware agencies tasked with providing this instruction, and ensuring that it is provided, in Delaware prisons cause the students to wait many weeks and months without any education, while the time period to receive their special education and related services continues to run and eventually lapses.  The education that is eventually provided fails to

2

comply with required law.  The Delaware agencies regularly fail to comply with procedural requirements to allow for the full participation of students and their parents in the development of the student's education program.  They limit the students' specialized instruction to the agency's perception of its available resources rather than to the students' needs, which has resulted in grossly deficient educational programming.  In parts of the correctional facilities, the limited education that is provided is in the most restrictive environment possible, in small rooms, without desks (until 2024), through plexiglass, or while shackled.  Furthermore, the Delaware agencies generally fail to provide any required related services such as counseling or other behavioral supports, leading to discipline imposed without consideration of whether the conduct may have been the result of the student's disability or unmet special education needs.

4.     Through this case, Plaintiff seeks an injunction ordering the state and its agencies to remedy their on-going failures, comply with the law, and thereby provide students with disabilities who are involved in the criminal justice system with a free appropriate public education.

## II

## JURISDICTION, VENUE, AND
## WAIVER OF SOVEREIGN IMMUNITY

5.     This action is brought under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*, Delaware law, 14 *Del.C.* § 3100, *et seq.*, and their respective implementing regulations.  The Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, and 20 U.S.C. § 1415(i)(2).  The Court has jurisdiction over the Delaware law claims pursuant to 28 U.S.C. § 1367(a).  The venue is proper under 28 U.S.C. § 1391 because the Defendants reside in Delaware and all of the events and omissions at issue arose in Delaware.

3

6.      Sovereign immunity is waived as to all claims.  *See* 20 U.S.C. § 1403(a); 42 U.S.C. §
2000d-7(a)(1); 42 U.S.C. § 12202; 14 Del. Admin. C. §§ 926.16.1, 926.16.4.

**III**

**PARTIES**

**A.      PLAINTIFF**

7.      Congress has mandated, through several statutes, that every state have an official
"protection and advocacy" (P&A) system to protect and advocate for the rights of people with
disabilities, including those with mental illnesses.  29 U.S.C. § 794e; 42 U.S.C. §§ 15001(b)(2),
15041-15045, 10801-10807.  P&As receive federal funds to advocate on behalf of individuals with
disabilities (29 U.S.C. § 794e; 42 U.S.C. § 15042; 42 U.S.C. § 10803) and have the responsibility
and authority to file lawsuits to ensure their protection (*see* 29 U.S.C. § 794e(f)(3); 42 U.S.C. §§
15043(a)(2)(A)(i), 15044(b)(1), 10805(a)(1)(B), 10807).

8.      P&As are governed by boards knowledgeable of the needs of the individuals whom
they serve.  42 U.S.C. §§ 10805(c)(1)(B), 15044(a)(1); 42 C.F.R. § 51.22(b)(2); 45 C.F.R. §
1326.21(g).  A majority of the members of such boards are required to be individuals with
disabilities or parents, family members, guardians, advocates, or authorized representatives of such
individuals.  *Id*.  P&As must also have advisory councils who are knowledgeable about related
issues (42 U.S.C. §§ 10805(a)(6)(B), (C), 15044(a)(5)(B); 42 C.F.R. § 51.23(b); 45 C.F.R. §
1326.21(g)) and provide procedures for public comment on the priorities and activities of the P&A
and grievance procedures for current and prospective clients (42 U.S.C. §§ 10805(a)(8), (9); 34
C.F.R. § 381.10(a)(7); 42 C.F.R. §§ 51.24, 51.25).

9.      The Community Legal Aid Society, Inc. (CLASI) is Delaware's P&A.  It is committed
to combatting injustice through civil legal advocacy on behalf of vulnerable and underserved
Delawareans, including those with disabilities.  CLASI serves a broad range of individuals with

disabilities, inclusive of those with mental illnesses.  CLASI satisfies the board, advisory council, public comment, and grievance requirements of a P&A described above.

10.   CLASI has devoted substantial resources to advocating and litigating for young adults who have suffered and continue to suffer as a result of the systemic failures described below.  As a result, CLASI has been unable to undertake other advocacy projects on behalf of Delawareans with disabilities or has otherwise had to limit the scope of its services.  CLASI continues this work by bringing this case.

**B.    DEFENDANTS**

**1.   <u>Adult and Prison Education Resources Workgroup</u>**

11.   The Adult and Prison Education Resources Workgroup (APER) is a workgroup of the Delaware Department of Education (DDOE).  APER is a public agency.  It was previously referred to as the Prison Adult Education Program (PAEP).

12.   APER and the Delaware Department of Correction (DDOC) have jointly administered the Prison Education Program since 2000.  *See* 11 *Del.C.* § 6531A(a) ("The Department of Education and the Department of Correction shall be jointly responsible for the administration of a prison education program.").  Through that work, DDOE (through APER) and DDOC are responsible for providing, inter alia, secondary, vocational, and special education to individuals incarcerated in Delaware's Level IV and V correctional facilities.  *See* 11 *Del.C.* § 6531A.

13.   James H. Groves Adult High School (Groves) is a Delaware public high school that provides adults (including those involved with the criminal justice system) and out-of-school youth with the opportunity to earn a high school diploma.  14 Del. Admin. C. § 915.1.0.  In Delaware correctional facilities, APER administers Groves, whereby students are educated primarily through self-study with little to no opportunity for classes with or without other students.

14.   APER receives federal funds.

### 2. **Maureen Forde-Whelan, Director of APER**

15.   Maureen Forde-Whelan is the Director of APER and is sued in her official capacity. In that role, Ms. Forde-Whelan oversees adult education throughout the State of Delaware, which includes the Prison Education Program and Groves.  In this role, Ms. Forde-Whelan is responsible for providing oversight for the educational services provided by APER, including special education for students with disabilities.  Ms. Forde-Whelan has served as the Director of APER since 2007 and was in this role when CLASI filed, on behalf of students, administrative complaints (state complaints and due process complaints) going back to 2009.  As described in depth below, these complaints resulted in findings against APER, and APER was required to take corrective action.

### 3. **Delaware Department of Education**

16.   DDOE is a Delaware executive agency with obligations to monitor and enforce compliance with federal and Delaware law related to the provision of special education and related services.

17.   DDOE receives federal funds.

18.   DDOE and DDOC operate the Prison Education Program pursuant to a Memorandum of Understanding.  The Memorandum of Understanding, executed on September 17, 2021, states:

> The Department of Education Prison Education Program's goal is to offer a quality adult education program that enables Level V sentenced offenders and detainees with special education needs and Level IV offenders with special education needs under age 22 to gain the skills and knowledge necessary to be productive workers, supportive family members and active community members while incarcerated and upon release.
>
> Through a collaborative effort, both agencies will work together to provide educational services to offenders needing academic credentialing such as a GED® [General Education Development] or high school diploma; skills building in preparation for training or employment; cognitive behavioral therapy/life skills; reentry preparation; digital literacy and/or vocational training.

### 4.   **Mark A. Holodick, Ed.D., Delaware Secretary of Education**

19.   Dr. Mark A. Holodick is the Delaware Secretary of Education and therefore is the head of DDOE.  The Secretary of Education is charged with "maintain[ing] a Prison Education Program which will provide educational services for the Department of Correction."  14 *Del.C.* § 2400.  Dr. Holodick is sued in his official capacity.  In that role, Secretary Holodick is responsible for maintaining an adequate prison education program.  Further, Secretary Holodick serves as the head of the State Educational Agency (SEA), and thus is responsible for the supervision of Delaware's public elementary and secondary schools.  20 U.S.C. § 1401(32) (describing role of the SEA); 14 Del. Admin. C. § 922.3.0 (defining SEA as DDOE).  CLASI provided Secretary Holodick, via his counsel, a letter detailing the systemic failings of APER's special education services more than a year ago, yet the failings have persisted.

### 5.   **Delaware Department of Correction**

20.   DDOC administers the correctional facilities at issue.  DDOC and DDOE jointly administer the Prison Education Program at those facilities.  Accordingly, the relief requested in this case could impact DDOC.  Moreover, if APER or DDOE assert that any DDOC policies, practices, or other requirements have any relevance to their defense, DDOC may need to be involved so that the Court may consider those issues and accord complete relief.  Furthermore, as described immediately above, there is an interagency agreement between DDOC and DDOE regarding the Prison Education Program.  *See* 34 C.F.R. §§ 300.103(a) & 300.154(a) (states may use state sources of support and execute interagency agreements to comply with IDEA obligations); 14 Del. Admin. C. §§ 923.54.1, 923.54.2 (same).  Accordingly, DDOC is a necessary party pursuant to Rule 19 of the Federal Rules of Civil Procedure.  No claims are raised against DDOC.

**6.  Terra Taylor, Commissioner of DDOC**

21.  Terra Taylor is the Commissioner of DDOC, is the head of DDOC, and is therefore responsible for the administration of the correctional facilities at issue in which students with disabilities are entitled to receive FAPE.  She is named in her official capacity.  However, as with DDOC, no claims are raised against Commissioner Taylor.

IV

STATUTORY BACKGROUND

**A.    THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT**

**1.  Generally**

22.  In 1975, Congress enacted the law now known as the Individuals with Disabilities Education Act (IDEA) "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living" and "to ensure that the rights of children with disabilities . . . are protected."  20 U.S.C. § 1400(d)(1).

23.  The IDEA is a federal grant program administered by the U.S. Department of Education (U.S. DOE).  The U.S. Secretary of Education provides funding to states and certain other entities for the provision of special education and related services.  *See* 20 U.S.C. § 1411.  A state becomes eligible for this funding by submitting to the Secretary a plan showing that it has in effect certain policies and procedures to fulfill the aims of the statute.  20 U.S.C. § 1412(a). Delaware accepts this funding and therefore must comply with the mandates contained in the IDEA and its implementing regulations.  *See* 20 U.S.C. § 1412(a); 34 C.F.R. § 300.2.

24.  The IDEA sets various requirements that must be met by SEAs and Local Education Agencies (LEAs).  *See, e.g.*, 20 U.S.C. §§ 1412, 1414.

8

25.   The SEA is generally "the State board of education or other agency or officer primarily responsible for the State supervision of public elementary schools and secondary schools[.]"  20 U.S.C. § 1401(32).  In Delaware, the SEA is DDOE.  14 Del. Admin. C. § 922.3.0.

26.   An LEA is "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools."  20 U.S.C. § 1401(19)(A).  APER is an LEA.

27.   The protections of the IDEA apply to students in various settings, including those in correctional facilities.  *See* 34 C.F.R. § 300.2(b)(1) (applies to "State and local juvenile and adult correctional facilities").

28.   Two exceptions are relevant here to students who are incarcerated.  First, if, prior to incarceration, the student was not identified as eligible for special education and related services, there is no requirement that the LEA identify that student or provide them with services when incarcerated.  *See* 20 U.S.C. § 1412(a)(1)(B); 34 C.F.R. § 300.102(a)(2).  Second, with regard to students convicted as adults under state law and incarcerated in an adult prison, the state may modify their individualized education program (IEP) or placement if it determines, following an individualized assessment, that it has "a bona fide security interest or compelling penological interest that cannot otherwise be accommodated."  34 C.F.R. § 300.324(d)(2)(i).

29.   Certain key provisions of the IDEA are described below.

**2.   Free Appropriate Public Education**

30.   A State receiving funding must provide "[a] free appropriate public education . . . to all children with disabilities residing in the State between the ages of 3 and 21, inclusive[.]"  20

U.S.C. § 1412(a)(1)(A).  This is known as the duty to provide FAPE.  Delaware regulations extend

this provision to students "until the receipt of a regular high school diploma or until August 31st

of the school year in which the child attains the age of 22, whichever occurs first."  14 Del. Admin.

§ 923.1.2.[1]

31.  FAPE is defined within the IDEA as:

[S]pecial education and related services that--(A) have been provided at public
expense, under public supervision and direction, and without charge; (B) meet the
standards of the State educational agency; (C) include an appropriate preschool,
elementary school, or secondary school education in the State involved; and (D) are
provided in conformity with the individualized education program [(IEP)] required
under [the IDEA].

20 U.S.C. § 1401(9).  Delaware law has a similar, but more expansive, definition of FAPE:

"Free appropriate public education" means special education that is specially
designed instruction including classroom instruction, instruction in physical
education, home instruction and instruction in hospitals and institutions, and related
services as defined by Department of Education rules and regulations approved by
the State Board of Education and as may be required to assist a child with a
disability to benefit from an education that:

a. Is provided at public expense, under public supervision and direction and
without charge in the public school system;

b. Meets the standards of the Department of Education as set forth in this
title or in the rules and regulations of the Department as approved by the
State Board;

c. Includes elementary, secondary or vocational education in the State;

d. Is individualized to meet the unique needs of the child with a disability;

e. Provides significant learning to the child with a disability; and

f. Confers meaningful benefit on the child with a disability that is gauged to
the child with a disability's potential.

---

[1] Since the students at issue in this case are young adults, this document hereafter generally
substitutes the term "student" for "child."

No court, administrative tribunal, school district, or school shall use a definition of "free appropriate public education" that states or implies that the term encompasses a lesser educational program than enumerated in this definition.

14 *Del.C.* § 3101(5) (emphases added).

32.   Each LEA is responsible for making FAPE available to all eligible students with disabilities residing in its jurisdiction.  20 U.S.C. § 1413(a)(1) (referencing obligation under 20 U.S.C. § 1412 to provide FAPE).

33.   Each SEA is responsible for ensuring that the requirements of the IDEA are met.  20 U.S.C. §§ 1412(a)(1)(A), 1412(a)(11)(A), 1416; 34 C.F.R. §§ 300.149, 300.600.  That includes ensuring that all students with disabilities in the state receive FAPE in accordance with the IDEA. 34 C.F.R. § 300.600(d).  The SEA must, inter alia, "make determinations annually about the performance of each LEA," provide "technical assistance" and use other appropriate "enforcement mechanisms," and "[r]eport annually" on the LEA's performance.  34 C.F.R. § 300.600(a).  "In exercising its monitoring responsibilities . . . the State must ensure that[,] when it identifies noncompliance . . . by LEAs, the noncompliance is corrected as soon as possible, and in no case later than one year after the State's identification of the noncompliance."  34 C.F.R. § 300.600(e). If the SEA determines that the LEA "is unable to establish and maintain programs of [FAPE] that meet the requirements of [the IDEA]," then it must provide "special education and related services directly to [students] with disabilities residing in the area served by that [LEA], or for whom that State agency is responsible."  20 U.S.C. § 1413(g)(1); 34 C.F.R. § 300.227(a).

### 3.  Evaluations

34.   Students must be evaluated to determine whether they are a student with a disability in need of special education and related services and the nature and extent of the special education and related services that they need.  *See* 20 U.S.C. § 1414(b), (c); 34 C.F.R. §§ 300.301, 300.303-300.305.  The evaluation process includes reviewing existing data and the results of assessments

conducted by qualified professionals. *Id.* The students in the Prison Education Program all had such evaluations and had IEPs prior to incarceration.

### 4. **Individualized Education Program**

35. A central tool of the IDEA is the IEP, which is "a written statement for each [student] with a disability that is developed, reviewed, and revised" in accordance with the IDEA and must provide extensive information regarding the student's education, including (20 U.S.C. § 1414(d)(1)(A)(i)):

(a) the student's "present levels of academic achievement and functional performance" (this is referred to elsewhere as the Present Levels of Educational Performance);

(b) "a statement of measurable annual goals, including academic and functional goals, designed to . . . meet the [student's] needs that result from . . . disability to enable the [student] to be involved in and make progress in the general education curriculum; and . . . meet each of the [student's] other educational needs that result from the [student's] disability";

(c) "a description of how the [student's] progress toward meeting the annual goals . . . will be measured and when periodic reports on the progress the [student] is making toward meeting the annual goals . . . will be provided";

(d) "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the [student], or on behalf of the [student], and a statement of the program modifications or supports for school personnel that will be provided for the [student] . . . to advance appropriately toward attaining the annual goals; . . . to be involved in and make progress in the general education curriculum in accordance with [the provision above] and to participate in extracurricular and other nonacademic activities; and . . . to be educated and participate with other [students] with disabilities and nondisabled [students] in the activities described [herein]";

12

(e)     "an explanation of the extent, if any, to which the [student] will not participate with nondisabled [students] in the regular class and in the activities described [above];

(f)     "a statement of any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the [student] on State and districtwide assessments";

(g)     "the projected date for the beginning of the services and modifications described [above], and the anticipated frequency, location, and duration of those services and modifications"; and

(h)     for students aged 14 and older, other items including "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills" and "the transition services (including courses of study) needed to assist the [student] in reaching those goals." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII) (requiring transition goals and services for students aged 16 and older); 14 Del. Admin. C. § 925.7.2 (lowering age to 14).

36.  A student's IEP is developed by the student's IEP Team, which is made up of (a) the student's parent(s), (b) the student (when appropriate), (c) at least one regular education teacher if the student is or may be in regular education, (d) at least one special education teacher or provider, (e) an LEA representative who is qualified to provide or supervise the provision of specially designed instruction and who is knowledgeable about the general education curriculum and the availability of resources of the LEA, (f) an individual who can interpret the instructional implications of evaluation results, who may be a member of the team described above, and (g) at the discretion of the parent or the LEA, other individuals who have knowledge or special expertise regarding the student.   20 U.S.C. § 1414(d)(1)(B).   Delaware law sets forth other required

participants.  *See* 14 Del. Admin. C. § 925.8.2.2 (for students aged 18 and older, "the public agency shall invite a representative of any participating agency that is likely to be responsible for providing or paying for transition services," such as the Delaware Division of Vocational Rehabilitation); 14 Del. Admin. C. § 926.20.1.3.1 ("In cases where capacity is uncertain, a school psychologist familiar with the [student] must attend the initial meeting.").

37.  "Special education," "related services," and "supplementary aids and services" are all defined in the IDEA.

(a)    "Special education" means "specially designed instruction, at no cost to parents, to meet the unique needs of a [student] with a disability" and includes instruction conducted in a variety of settings and instruction in physical education.  20 U.S.C. § 1401(29).

(b)    "Related services" include "such developmental, corrective, and other supportive services . . . as may be required to assist a [student] with a disability to benefit from special education[.]"  20 U.S.C. § 1401(26)(A).  For example, an IEP may include "positive behavioral interventions and supports, and other strategies, to address . . . behavior" (20 U.S.C. § 1414(d)(3)(B)(i)), such as functional behavior assessments and behavior support plans (also termed behavior intervention plans).  Addressing this topic in the context of correctional facilities, the U.S. DOE explained:

> [T]he special factors that the IEP Team must consider in developing, reviewing, and revising the IEP of each student with a disability are particularly relevant to students with disabilities in correctional facilities.  Among these special factors is the requirement for the IEP Team to consider the use of positive behavioral interventions and supports and other strategies to address behavior in the case of a student whose behavior impedes his or her learning or the learning of others (34 CFR §300.324(b)(2)).  Appropriate implementation of these positive behavioral interventions and supports and other strategies to address behavior should ensure that the student is able to benefit from his or her educational program in the correctional facility, and hasten the student's transition from the facility and reentry into the community. . . . IEP Teams should pay particular attention to those related services that are likely to be required for students in correctional facilities -- for

> example, counseling, parent counseling and training, psychological services, transportation, and social work services in schools (34 CFR §300.34(c)(2), (c)(8), (c)(10), (c)(14), and (c)(16)).

U.S. DOE Dear Colleague Letter (December 5, 2014) ("U.S. DOE 2014 Dear Colleague Letter"), pp. 13-14.

(c)     "Supplementary aids and services" means "aids, services, and other supports that are provided . . . to enable [students] with disabilities to be educated with nondisabled [students] to the maximum extent appropriate in accordance with [the least restrictive environment requirement described below]. 20 U.S.C. § 1401(33).

38. An IEP must be "reasonably calculated to enable a [student] to make progress appropriate in light of the [student's] circumstances." *Endrew F. v. Douglas County Sch. Dist.*, 580 U.S. 386, 399 (2017). In crafting such a document, LEAs must give "careful consideration of the [student's] present levels of achievement, disability, and potential for growth." *Id.* at 400 (citing the IDEA). The IEP "must be designed to enable the [student] to be involved in and make progress in the general education curriculum." U.S. DOE Dear Colleague Letter (November 16, 2015), p. 2 (citing 20 U.S.C. § 1414(d)(1)(A)). "[I]n order to make FAPE available to each eligible [student] with a disability, the special education and related services, supplementary aids and services, and other supports in the [student's] IEP must be designed to enable the [student] to advance appropriately toward attaining his or her annual IEP goals and to be involved in, and make progress in, the general education curriculum based on the State's academic content standards for the grade in which the [student] is enrolled." *Id.*, p. 4.

39. The IEP Team must consider whether extended school year services are needed to ensure a student receives FAPE. 34 C.F.R. § 300.106. Extended school year services must be considered even in full-year programs, such as the Prison Education Program. *See* Final Department of Education Regulations (Assistance to States for the Education of Children with

Disabilities and Preschool Grants for Children With Disabilities), 71 Fed. Reg. 46540-01, 46582 (Aug. 14, 2006) ("nothing in § 300.106 . . . limit[s] a public agency from providing ESY [extended school year] services to a [student] with a disability during times other than the summer, such as before and after regular school hours or during school vacations, if the IEP Team determines that the [student] requires ESY services during those time periods in order to receive FAPE").

40.   "As soon as possible following development of the IEP, special education and related services [must be] made available to the [student] in accordance with the [student's] IEP."  34 C.F.R. § 300.323(c)(2); *see* 20 U.S.C. § 1401(9)(D) (student must be educated "in conformity with the [IEP]").

41.   DDOE is required to "establish[] and maintain[] qualifications to ensure that personnel necessary to carry out [the IDEA] are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities."  20 U.S.C. § 1412(a)(14)(A).  Those qualifications require, for special education teachers, "full State certification as a special education teacher" or passage of "the State special education teacher licensing examination."  20 U.S.C. § 1412(a)(14)(C); *see also* 14 *Del.C.* § 2402 ("The qualifications of employees for the Prison Education Program, except secretaries, shall be the same as those qualifications for employees in public high schools."); 14 Del. Admin. C. § 1571 (Delaware requirements for Special Education Teachers of Student with Disabilities).

**5.   Least Restrictive Environment**

42.   The IDEA requires states to have:

[I]n effect policies and procedures to ensure that . . . (5) [t]o the maximum extent appropriate, [students] with disabilities . . . are educated with [students] who are not disabled, and special classes, separate schooling, or other removal of [students] with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a [student] is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

16

20 U.S.C. § 1412(a).  This is the requirement to educate students in the least restrictive environment.

43.  To ensure that a student is educated in their least restrictive environment, public agencies, including LEAs, are required to offer a "continuum of alternative placements," such as instruction in regular classes, instruction in regular classes with supplementary aids and services, special education pull-out services, and separate special education classes.  34 C.F.R. § 300.115. The determination of a student's least restrictive environment must be an individualized determination made by the IEP Team.  *See* 34 C.F.R. § 300.116.  Furthermore, when focusing on correctional facilities in 2014, the U.S. DOE explained:

> The IDEA requirements related to the least restrictive environment . . . apply to the education of students with disabilities in correctional facilities.  IEP Teams or placement teams must make individualized placement decisions, and may not routinely place all students with disabilities in correctional facilities in classes that include only students with disabilities, even if this means creating placement options or using other arrangements, to the maximum extent appropriate to the student's needs.

U.S. DOE 2014 Dear Colleague Letter, p. 4.

### 6.  Manifestation Determination Review

44.  When a student with a disability is punished for violation of a code of conduct that results in the denial of educational services in the least restrictive environment for more than 10 days, consecutively or over the course of the school year, the IEP Team must determine if the conduct was a manifestation of the student's disability (*i.e.*, was the behavior caused by or did the behavior have a direct and substantial relationship to the student's disability or was it a direct result of the LEA's failure to implement the IEP).  *See* 20 U.S.C. § 1415(k)(1)(E); 34 C.F.R. § 300.530(e)(1).  If the IEP Team determines that the violation was a direct result of the LEA's failure to implement the IEP, "the LEA must take immediate steps to remedy those deficiencies."

34 C.F.R. § 300.530(e)(3); *see also* 20 U.S.C. § 1415(k)(1)(E)-(F).  If the IEP Team determines that the conduct was a manifestation of the student's disability, the IEP Team must:

> (1) Either—(i) Conduct a functional behavioral assessment, unless the LEA had conducted a functional behavioral assessment before the behavior that resulted in the change of placement occurred, and implement a behavioral intervention plan for the [student]; or (ii) If a behavioral intervention plan already has been developed, review the behavioral intervention plan, and modify it, as necessary, to address the behavior; and (2) Except [in special circumstances related to weapons, drugs, and serious bodily injury], return the [student] to the placement from which the [student] was removed, unless the parent and the LEA agree to a change of placement as part of the modification of the behavioral intervention plan.

34 C.F.R. § 300.530(f); *see also* 20 U.S.C. § 1415(k)(1)(F).  "On the date on which the decision is made to make a removal that constitutes a change of placement . . . , the LEA must notify the parents of that decision, and provide the parents" with notice of procedural rights.  34 C.F.R. § 300.530(h).

45.  These requirements apply with equal force in correctional facilities.  The U.S. DOE explained:

> Any exclusion from the classroom is particularly harmful for students with disabilities in correctional facilities.  In general, even in the presence of disciplinary concerns, because correctional facilities are run by public entities, their obligation to ensure that special education and related services are provided to eligible students with disabilities continues.
>
> A student with a disability in a correctional facility who violates a code of student conduct is entitled to the protections in the IDEA discipline procedures that must be afforded to all students with disabilities.  These protections apply regardless of whether a student who violates a code of student conduct is subject to discipline in the facility or removed to restricted settings, such as confinement to the student's cell or "lockdown" units.  In any event, a removal from the current educational placement that results in a denial of educational services for more than 10 consecutive school days, or a series of removals that constitute a pattern that total more than 10 school days in a school year is a change in placement, which, in turn, requires a manifestation determination under the IDEA.

U.S. DOE 2014 Dear Colleague Letter, p. 5.

7.   **Annual IEP Reviews and Triennial Reevaluations**

46.   LEAs must hold IEP Team meetings and review students' IEPs at least annually "to determine whether the annual goals for the [student] are being achieved" and revise the IEP as appropriate.   20 U.S.C. § 1414(d)(4); 34 C.F.R. § 300.324(b).   Moreover, students must be reevaluated at least every three years.   20 U.S.C. § 1414(a)(2)(B).

8.   **School Transfers**

47.   When a student with disabilities transfers to a new public agency within the state (such as when a student with an IEP becomes incarcerated), the receiving public agency (here, APER), in consultation with the parents, must (1) provide FAPE, including services comparable to those described in the previous IEP, until (2) the new public agency either adopts the prior IEP or develops, adopts, and implements a new IEP.   20 U.S.C. § 1414(d)(2)(A), (C)(i); 34 C.F.R. § 300.323(a), (e); U.S. DOE 2014 Dear Colleague Letter, p. 4.   Delaware law requires the receiving public agency to either adopt the prior IEP or develop, adopt, and implement a new IEP within sixty days of the student's transfer to the receiving agency.   14 Del. Admin. C. §§ 925.10.4-925.10.5.

48.   Moreover, when a student transfers between schools within an LEA (such as when a student who was enrolled in school at one correctional facility transfers to another), the student should also promptly receive appropriate education and related services pursuant to the existing IEP.

9.   **Other Procedural Requirements**

49.   The IDEA sets forth numerous other procedural requirements designed to ensure that students receive FAPE and that students and their parents continue to understand and be involved in the student's education.   These requirements apply even when the student is in a correctional

facility.  2014 U.S. DOE Dear Colleague Letter, p. 17.  The following are just a few of the procedural requirements:

(a)      Both adult students and their parents must be invited to IEP Team meetings wherein a student's capacity to make educational decisions is determined.  *See* 20 U.S.C. § 1415(m)(2) (incorporating state law; 14 *Del.C.* § 3132; 14 Del. Admin. C. § 926.20.0); *see also* 14 Del. Admin. C. § 926.20.1 ("To assure that children with disabilities who have reached age 18 have an identified decision-maker, which may be the [student] with a disability, the IEP team shall discuss the potential need for an educational representative during the transfer of rights at age of majority review, and annually thereafter.").  This requirement applies even when the student is in a correctional facility.  As the U.S. DOE explained:

> Parental engagement in a student's education is particularly important when a student with a disability is in a correctional facility.  Parents who remain involved with their child's education while the student is in a correctional facility will be better equipped to provide needed support to the student when he or she exits the facility and returns to the community and/or school.  Unless the State has opted to transfer parental rights at the age of majority under 34 CFR §300.520(a) . . . , parents do not lose their rights under the IDEA when their child is placed in a correctional facility, even if the student has been convicted as an adult and incarcerated in an adult prison.

U.S. DOE 2014 Dear Colleague Letter, p. 17 (footnote omitted).

(b)      Adult students and parents must receive a copy of procedural safeguards, provide consent for evaluations and provide consent before the initial provision of special education and related services, and have the opportunity to be involved in the decision-making related to the student's educational program and placement.  *See*, *e.g.*, 20 U.S.C. §§ 1414(a)(1)(D), (b)(4), (c)(1)(B), (c)(3), (c)(4), (d)(1)(B), (d)(3)(A), (e); 1415(b)(1); *see also* 20 U.S.C. § 1415(m)(2) (incorporating state law; 14 *Del.C.* § 3132; 14 Del. Admin. C. § 926.20.0); 34 C.F.R. § 300.530(h).

(c)     Written notices that address various items (called Prior Written Notices in Delaware) must be provided to adult students and parents, including those of students who are in correctional facilities, at a reasonable time (ten school days under Delaware law, *see* 14 Del. Admin. C. § 926.3.1) before an LEA "(A) proposes to initiate or change; or (B) refuses to initiate or change, the identification, evaluation, or educational placement of the [student], or the provision of a free appropriate public education to the [student]."  20 U.S.C. § 1415(b)(3), (c)(1); *see also* 20 U.S.C. § 1415(m)(2) (incorporating state law; 14 *Del.C.* § 3132; 14 Del. Admin. C. § 926.20.0); U.S. DOE 2014 Dear Colleague Letter, p. 17.

(d)     Adult students and parents must have an opportunity "to examine all [student] records."  20 U.S.C. § 1415(b)(1); *see also* 20 U.S.C. § 1415(m)(2) (incorporating state law; 14 *Del.C.* §§ 3130, 3132; 14 Del. Admin. C. § 926.20.0); 34 C.F.R. § 300.613; 14 Del. Admin. C. § 926.1.2.2 ("[p]arents shall have the right to obtain copies of all educational records").

**10. <u>Compensatory Education and Compensatory Services</u>**

50. Compensatory education and compensatory services are education and services designed to make up for a student's loss in educational progress when an LEA fails to provide what is required in a student's IEP.

**B.     THE REHABILITATION ACT**

51. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations, 34 C.F.R. § 104, *et seq.*, forbid discrimination against or excluding an otherwise qualified person with a disability from participation in a federally funded program or activity because of the person's disability.  "Program or activity" is defined to include "all of the operations of . . . a local educational agency . . . or other school system[.]"  29 U.S.C. § 794(b)(2)(B).  Written plans to accommodate students' disabilities are generally referred to as "504 Plans."

52.   The students with disabilities incarcerated in Level V facilities in Delaware are qualified individuals under the Rehabilitation Act (and the ADA, described below) because they have a physical or mental impairment that substantially limits one or more major life activities, including learning, concentrating, and thinking and are, will be, or were enrolled, and meet the essential eligibility requirements to be enrolled, in an educational program while incarcerated.  29 U.S.C. § 794(a) (cross-referencing 29 U.S.C. § 705(20), which cross-references 42 U.S.C. § 12102(1)); 42 U.S.C. § 12102(1) (defining "disability"); 42 U.S.C. § 12131(2) (defining "qualified individual with a disability"); 34 C.F.R. § 104.3(l)(2) (defining "[q]ualified handicapped person").

53.   In addition to prohibiting discrimination (34 C.F.R. § 104.4), the Rehabilitation Act regulations require that publicly-funded services "must afford [people with disabilities] equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs."  34 C.F.R. § 104.4(b)(2).

54.   The Rehabilitation Act regulations include many provisions that are similar to those under the IDEA.  As with the IDEA, the Rehabilitation Act regulations require a recipient of federal financial assistance from the U.S. DOE to provide FAPE to qualified students with disabilities.  *See* 34 C.F.R. § 104.33.  FAPE is defined in the Rehabilitation Act as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34 [regarding "Educational setting"], 104.35 [regarding "Evaluation and Placement"], and 104.36 [regarding "Procedural Safeguards"]."  34 C.F.R. § 104.33(b)(1).  Recipients of federal funds must also provide for students with disabilities to be educated with their non-disabled peers, to the

maximum extent appropriate (34 C.F.R. § 104.34); establish standards and procedures for the evaluation and periodic reevaluation and placement of persons who, because of a disability, need special education or related services (34 C.F.R. § 104.35); ensure that tests and evaluation materials are tailored to assess areas of educational need, accurately reflect the student's aptitudes or achievement level, and are validated and administered by trained professionals (*id.*); ensure that appropriate placement decisions are made based on a variety of sources and by individuals knowledgeable of the student, the data, and the placement options (*id.*); and provide for periodic reevaluation (*id.*).  Further, a recipient of federal funds must "establish . . . a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure."  34 C.F.R. § 104.36.

55.  Furthermore, the Rehabilitation Act prohibits retaliation against students with disabilities for exercising their rights.  *See* 34 C.F.R. § 104.61 (incorporating, inter alia, 34 C.F.R. 100.7), 100.7(e) ("Intimidatory or retaliatory acts prohibited").

## C.    THE AMERICANS WITH DISABILITIES ACT

56.  The ADA, 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  The ADA regulations require full and equal access or accommodations to education to students with disabilities.  *See* 28 C.F.R. §§ 35.130(b)(1)(i)-(v), (vii), (b)(2), (3), (6)-(8).  Moreover, "public entit[ies] shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).

57.  A "public entity" includes a state government, its agencies, and its instrumentalities. 42 U.S.C. § 12131(1).  Defendants are public entities that are responsible for providing education to students with disabilities who are in correctional facilities.

58.  As described above with regard to the Rehabilitation Act, the students with disabilities incarcerated in Level V facilities in Delaware are qualified individuals under the ADA.

59.  Furthermore, the ADA prohibits retaliation against students with disabilities for exercising their rights.  *See* 42 U.S.C. § 12203(a) (prohibition against retaliation); 28 C.F.R. § 35.134 ("Retaliation or coercion").

**D.    DELAWARE LAW REGARDING SPECIAL EDUCATION AND RELATED SERVICES**

60.  Delaware law provides the same and additional protections.  For example, there are similar requirements to provide FAPE (*see* 14 *Del.C.* §§ 3101(5), 3120-3121) and similar procedural protections (14 *Del.C.* §§ 3130, 3132-3134).

61.  Moreover, Delaware regulations "implement, complement and supplement" the IDEA, federal regulations, and Delaware law.  14 Del. Admin. C. § 922.1.0.  They explicitly apply to correctional facilities (14 Del. Admin. C. § 922.2.2.4); require that, to the "maximum extent appropriate," students with disabilities be educated with students without disabilities and that DDOE monitor to ensure as much and that all other special education regulations are satisfied (14 Del. Admin. C. §§ 923.14.2, 923.20.1, 923.20.2, 923.49.1); prohibit any "public agency [from making] educational placement decisions on the basis of funding sources or amount of funding [rather than] . . . the unique needs of a [student]" (14 Del. Admin. C. § 923.14.2.1); and require that "[a] written Interagency Agreement . . . be developed between or among LEAs or other public agencies" when special education and related services are provided by an LEA other than one in the student's neighborhood (14 Del. Admin. C. § 923.14.4).  There are also numerous other

relevant provisions, including those regarding the prompt provision of FAPE when students transfer LEAs (14 Del. Admin. C. §§ 925.10.0, 925.10.4, 925.10.5), extended school year services (14 Del. Admin. C. § 923.6.0), parental consent (14 Del. Admin. C. § 925.1.0), capacity determinations (14 Del. Admin. C. § 926.20.1.3), initial evaluations (14 Del. Admin. C. §§ 925.2.0, 925.4.0, 925.5.0), reevaluations (14 Del. Admin. C. §§ 925.3.0, 925.4.0, 925.5.0), parent participation (14 Del. Admin. C. §§ 925.9.0, 925.9.3, 926.1.3, 926.1.4), student and parent input in advance of meetings (14 Del. Admin. C. § 925.9.3.1), development, review, and revision of the IEP (14 Del. Admin. C. §§ 925.7.0, 925.11.0), the IEP Team (14 Del. Admin. C. § 925.8.0), least restrictive environment (14 Del. Admin. C. § 925.13.0); opportunity to timely examine and receive copies of records (14 Del. Admin. C. §§ 926.1.2, 927.13); prior written notice and notice of procedural safeguards (14 Del. Admin. C. §§ 925.9.1.1, 926.3.1, 926.4.1); manifestation determination reviews (14 Del. Admin. C. § 926.30.0); and the obligation of DDOE to monitor compliance with these regulations and report annually on the performance of each LEA and ensure that noncompliance is corrected as soon as possible and "in no case later than one year after" it is identified (14 Del. Admin. C. §§ 927.1.0, 927.2.2, 927.3.0).

## V

## FACTS

## A.   DELAWARE LEVEL V CORRECTIONAL FACILITIES

62.  In Delaware, DDOC correctional facilities are referred to as Level V correctional facilities if they incarcerate people for 24 hours a day (for example, there is no daytime work release). Delaware is a unitary system, meaning the Level V facilities house both individuals who are sentenced and those who are not yet sentenced—there is no separate jail for detained individuals. Delaware has four Level V correctional facilities, all of which house 18-22-year-old students. This case relates to Howard R. Young Correctional Institution ("Young") and James T.

Vaughn Correctional Center ("Vaughn"), which are two of Delaware's Level V correctional facilities.

63.   Young houses male inmates.  It has a West Side and an East Side.  In general, detainees (those awaiting trial) are housed on the West Side and individuals who have been sentenced are housed on the East Side.  Some individuals who have been sentenced remain on the West Side for a period of time following sentencing or even return to the West Side if they are sent to the restrictive housing unit (or "the hole") for discipline.

64.   Vaughn houses male detainees and male individuals who have been sentenced. Within Vaughn is the Security Housing Unit (SHU), which is the maximum-security unit in the State of Delaware, where individuals can be assigned, inter alia, for having engaged in repeated or numerous behavioral infractions.

65.  DDOE and/or APER have been responsible for administering education to students with disabilities at Young and Vaughn since at least the year 2000.

**B.   DELAWARE AGENCIES HAVE KNOWN FOR YEARS OF THEIR FAILURES TO EDUCATE STUDENTS WITH DISABILITIES WHO ARE INCARCERATED**

66.  Delaware agencies have for years been criticized for their failure to educate incarcerated students with disabilities as required.

67.  First, in Findings and Conclusions issued on December 29, 1989, the U.S. DOE Office for Civil Rights (OCR) found various violations of federal law at the facility now known as Young. Beyond addressing the inmate's individual circumstances, in a section entitled "Class Complaint," OCR stated:

> [The Delaware Department of Public Instruction (DPI) (predecessor to DDOE)] and [DDOC] admit that prior to September 11, 1989, detainees and inmates at the Gander Hill Prison [now known as Young] between the ages of 18 and 21 were not screened to identify their handicapping conditions and needs for special education and related aids and services.  Moreover, DPI and [DDOC] acknowledge that special education services have not been provided to its eligible detainees and

26

inmates between the ages of 18 and 21 at the Gander Hill Prison. . . . OCR concludes that DPI and [DDOC] have failed to provide a [FAPE], in violation of the Section 504 regulation at 34 C.F.R. Sections 104.33(a), 104.35 and 104.36, by failing to identify, evaluate and provide special education services, including related aids and services, to qualified handicapped incarcerated persons between the ages of 18 and 21 at the Gander Hill Prison.

68.   Second, on October 5, 2009, DDOE issued a Final Report Regarding Administrative Complaint 10-2, concluding that students at Young were not receiving FAPE as a result of staffing shortages.  DDOE[2] was required to provide a minimum of a two-hour training session to its staff and provide compensatory education to the students at issue.

69.   Third, on July 3, 2013, DDOE issued a Final Report Regarding State Complaint 14-1, which explained that students at Young were not receiving required instruction:

> The [Prison Adult Education Program (as APER was previously known)] limits all IEPs to one-half hour of instruction per week because [it] can guarantee eligible pretrial detainees *at least* one-half hour of instruction per week notwithstanding certain constraints imposed by the DOC. . . . [I]t is clear that a blanket policy limiting IEPs for ***all*** pre-trial detainees to a maximum of one-half hour of instruction fails to comport with the requirement that instruction be individualized to meet the unique needs of the student.  *See* 14 *Del. C.* § 3101(5).

DDOE was required to provide "a full-day training session" to its staff, provide compensatory education, and take other corrective actions.

70.   Fourth, APER was audited by DDOE in 2017.  That review identified several areas of noncompliance at Young, including IEP development and implementation.  DDOE provided the conclusions of its review to APER and ordered remediation to include training on IDEA requirements.  APER did not change any of its policies in response.

71.   Fifth, on May 29, 2020, DDOE issued a Decision Regarding State Complaint 20-11. That Decision identified months-long delays in delivering education and ultimately explained that

---

[2] As noted above, APER is a workgroup of DDOE.

APER deprived the student of FAPE by providing standardized (not individualized) instruction ranging from 15 minutes to a maximum of one hour per session.

72.   Sixth, also on May 29, 2020, DDOE issued a Decision Regarding State Complaint 20-12, which explained that APER violated federal and Delaware law by failing to hold a timely IEP meeting for the student, failing to provide notice and obtain the student's consent before beginning the evaluation process, failing to individualize evaluations, and having a "blanket practice limiting IEPs for all pre-trial detainees to a maximum of 60 minutes of instruction per instructional session."

73.   With regard to both State Complaint Decisions that issued on May 29, 2020, APER was required to provide a detailed plan on how it would train all of its staff and implement a variety of other corrective actions.

74.   Seventh, on November 9, 2021, with regard to two State Complaints (DE SC 22-01 and 22-02), DDOE found APER responsible for many violations that harmed the students' education.   DDOE identified errors and problems regarding, inter alia, proper eligibility classification, present levels of achievement, appropriate goals, accommodations, modifications, and notices.   One of the corrective actions ordered was for APER to provide its staff with training on evaluation procedures, requirements for evaluations and reevaluations, eligibility criteria for the various educational classifications, the required participants at eligibility meetings, identifying areas of need, developing measurable present levels of educational performance, and the difference between accommodations and modifications.

75.   As shown below, despite these numerous findings and administrative orders issued across decades, APER has continued to shirk its responsibilities and thus these significant and systemic problems have continued.   Given these extensive failures and DDOE's knowledge of

them as demonstrated in the decisions described above, it is apparent that DDOE is either failing to oversee APER or its oversight is entirely ineffective.

## C. APER POLICIES AND PRACTICES CONTINUE TO SYSTEMATICALLY VIOLATE FEDERAL AND DELAWARE LAW

76.   APER systemically fails to comply with federal and Delaware law in ways that result in substantial harm to students, including the failure to deliver FAPE.  APER fails to evaluate students based upon their individual needs, fails to craft appropriate IEPs, fails to provide needed education and services, fails to provide education in an environment conducive to education, fails to provide education in the least restrictive environment, and fails to conduct manifestation determination reviews to determine if a student is being punished for conduct that is the result of the student's disabilities or otherwise related to APER's failure to act in accordance with the student's IEP.   Moreover, APER systemically fails to comply with numerous procedural protections that are designed to ensure that students receive FAPE.   Each of these failures, individually and combined, deprive students of FAPE.  These deficiencies are described below.

### 1. Systemic Failure to Provide FAPE, Including Comparable Services, and to Timely Develop, Adopt, and Implement an IEP upon Transfer to APER

77.   This case relates to students who have IEPs at the time that they enter the custody of DDOC.  APER systemically fails to timely provide FAPE, including services comparable to those in the existing IEPs and to timely develop, adopt, and implement new IEPs designed to provide students with FAPE.

### 2. Systemic Failure to Thoroughly Evaluate Students Based Upon Their Individual Needs

78.   When evaluating students that come into DDOC custody or conducting triennial reevaluations, APER generally provides the same assessments for every student, regardless of their needs.  It also fails to evaluate students in all areas of suspected disability.  APER generally fails

to conduct functional behavioral assessments of students that need them.  These practices deprive students of the assessments that they need and subjects them to assessments that they do not need.

### 3.   Systemic Failure to Craft Appropriate IEPs that Provide for Needed Specialized Instruction, Related Services, and Supplemental Aids and Supports

79.   APER generally crafts similar IEPs for all students, regardless of their identified individualized needs.  This deprives students of the education and services that they need.

80.   APER's IEPs provide for woefully deficient amounts of specialized instruction.  The amount of instruction in IEPs is based on APER's capacity and resources rather than on the students' needs.  The amount of time identified as specially designed instruction in a student's IEP represents, for detained students and most incarcerated students, the total amount of education provided to the student.

81.   In general, APER's IEPs have not included any related services or supplementary aids and services, and, despite the behavioral needs of many of the students, do not include behavior support plans.

82.   APER fails to assess the need for extended school year services.

### 4.   Systemic Failure to Implement IEPs as Required and Provide Needed Education and Services

83.   APER fails to provide anything vaguely comparable to education in traditional public high schools.  At its core, APER generally fails to provide instruction.  While this Complaint occasionally refers to this as instruction because that is how it is characterized under the IDEA, the education provided at Young and Vaughn is better characterized as self-study with limited guidance.  It comes nowhere close to the requirement for "an appropriate secondary school education," which is required for a student to receive FAPE.

84.   APER also provides woefully inadequate special education.  The special education is also better characterized as self-study with limited guidance.  Even if it were accurately

characterized as instruction, which it generally is not, APER fails to provide even the number of hours of specialized instruction set forth in the deficient IEPs.

85.   On information and belief, there is currently a waitlist to receive special education at Young.  This means the IEPs are not being carried out at all for the students on the waitlist.

86.   Full-time students in grades 11 and 12 must be provided 1,060 and 1,032 hours, respectively, of educational programming per school year.  14 *Del.C.* § 1049(a)(1); *see also* 14 Del. Admin. C. § 923.9.0.   For a year-round school like Groves, that is the equivalent of approximately 20 hours per week for 52 weeks.  APER's IEPs generally provide far less—in the range of a few hours per week—with less instruction for students who are awaiting trial than for those who have been convicted and sentenced.   APER fails to provide sufficient specialized instruction and other education necessary to be involved in and make progress in the general education curriculum.

87.   Despite the behavioral and other needs of many of its students, and despite the requirements of federal and Delaware law, APER generally does not include related services or supplementary aids and services in IEPs.  However, even where related services may be included in an IEP, APER generally fails to provide such services.

88.   APER does not provide any extended school year services.

89.   APER does not provide physical education.

90.   APER lacks the staff to provide compensatory education when needed, such as if it is ordered after a due process hearing or if an IEP Team determines that it is appropriate in light of missed education.

5. **Systemic Failure to Provide Education in an Environment and Manner Conducive to Education**

91.   The education that APER offers is often provided in a manner that is not conducive to education and deprives students of FAPE.  For example, APER has a practice of educating some students through plexiglass separating them from their teacher, and other students while shackled to their table, even though there is no security determination necessitating these restrictive placements.

92.  Students at Young who are classified to the Boarding School on the East Side of Young known as Q Pod are scheduled to receive two hours of "education" per day Monday through Friday, one hour in the morning and one hour in the afternoon.  Students assigned to Q Pod are either working toward a GED, high school diploma, or are considered pre-GED (gaining the foundational skills that apply to everyday life such as computer literacy, life skills, or basic education in reading, math, and writing).  During the scheduled educational sessions, students generally work independently while an educator walks around the room to attempt to ensure the students are on task.

93.  Young has generally had one certified special education teacher that provides specialized instruction for students with IEPs.  When that teacher is not available, students generally do not receive any education from a certified special education teacher.  As of the filing of this Complaint, the special education teacher at Young has been on leave for approximately three months.  APER's failure to provide enough teachers, and to provide enough teachers who are qualified to provide the needed instruction, prevents students from receiving FAPE.

6. **Systemic Failure to Provide Education in the Least Restrictive Environment**

94.  APER does not consider the student's least restrictive environment when crafting IEPs and therefore systemically fails to educate students in their least restrictive environment.

95. APER-developed IEPs include the same language under the heading for least restrictive environment for every student with an IEP, which provides that students are court-mandated to the DDOC facility and housing unit, and that the placement can change based on housing and security concerns.   APER has indicated this is the result of guidance from the Exceptional Children's Resources Workgroup (ECR), another workgroup within the DDOE specifically tasked with monitoring special education within Delaware.

7. **Systemic Failure to Make Manifestation Determinations and Then Take Required Follow-Up Action and the Practice of Removing Special Education and Related Services as Punishment**

96.  The requirement to make manifestation determinations applies in the incarceration context as in the non-incarceration context.  Since at least 2015, APER has never made a manifestation determination or otherwise held a manifestation determination review, conducted a functional behavior assessment, developed a behavior support plan, or adopted a student's prior behavior support plan.  On information and belief, this failure was occurring prior to 2015.  This failure is particularly problematic since many students with IEPs who are incarcerated require behavioral interventions, and, without them, engage in conduct that results in discipline.

97.  Furthermore, when students are sent to restrictive housing as punishment, some students are deprived entirely of education (including special education) and other times students receive very little education.

8. **Systemic Failure to Provide Timely Reevaluations and Annual IEP Reviews**

98.  APER systemically fails to timely reevaluate students and hold annual IEP reviews as required.

9. **Systemic Failure to Provide Required Procedural Protections Necessary to Involve Students, Their Parents, and Their Counsel in their Education and the Provision of FAPE**

99.   APER generally fails to provide required notices to students and parents (with regard to legal protections, evaluations, IEP meetings, and changes of placements), to hold IEP Team Meetings when students' placements are changed, to involve students and their parents in decision-making as to the students' education, and to timely provide educational records to students, parents, and counsel for the students.

10. **Systemic Failure to Afford Students with Disabilities the Opportunity to Participate in and Benefit from Education that Is Designed to Meet Their Needs as Adequately as the Needs of Non-Disabled Students**

100. Each of the failures described above demonstrate that Defendants discriminate against students because of their disabilities by failing to provide them with education that meets their unique needs.  To participate in or benefit from their high school education, students without disabilities do not need the same type of instruction, supports, and aids, as do students with disabilities.  Defendants deprive students with disabilities of equal access to education.

101. In addition to the deficiencies described above, this discrimination against students with disabilities is underscored by APER's administration of the Certificate of Education Attainment (CEA3) portfolio for incarcerated students.  CEA3 is an optional, expedited way for students enrolled at Groves to earn up to ten non-core credits toward their high school diploma.  *See* 14 Del. Admin. C. § 915.3.1.15.  The CEA3 portfolio was instituted to enable students to earn credit towards a diploma by demonstrating their knowledge and skills through research, writing, and testing.  To be awarded high school credit through the CEA3 portfolio, a student must meet the competency requirements on the Test of Adult Basic Education (TABE) or obtain their GED and receive a passing grade on a research paper.  The TABE is the state-approved assessment that APER administers to students upon entering Groves, which is similar in rigor to the GED test.

34

102. Students in the Prison Education Program who choose to pursue the CEA3 are required to work with their teacher to prepare, review, and revise their research paper as much as possible before it is sent first to the Teacher/Supervisor for review, then to the CEA3 Evaluation Team to ensure that requirements are met, and finally to the CEA3 Graders Team for scoring.

103. APER does not have a process to effectively accommodate students with disabilities with regard to the CEA3.  As a result, on information and belief, no students with disabilities who have submitted a CEA3 paper passed on their first submission, and, on information and belief, since APER began offering the CEA3 portfolio to students at Young in 2020, only two students with disabilities have received a passing grade on the paper.  In contrast, on information and belief, nearly every other student without disabilities (approximately 98%) have passed the CEA3 paper on their first submission.

## D.   RECENT STUDENT EXPERIENCES DEMONSTRATE APER'S SYSTEMIC FAILURES

104. The following examples demonstrate APER's systemic failures to comply with federal and Delaware law concerning education for students with disabilities.

105. CLASI has represented the three students described in this section in administrative proceedings, all of which were resolved in favor of the student by their respective DDOE Special Education Due Process Hearing Panels and are now pending before this Court.

### 1.   A.A.[3]

#### (a)   Background

106. A.A. was born in 2002.  He has been receiving some form of educational support since approximately kindergarten.  When he was ten years old, he suffered a concussion, after which he

---

[3] The individuals described herein have been identified by fictitious initials to protect sensitive information.  Plaintiff is filing herewith a motion for a protective order, which would protect those

became angrier and more frustrated.  When he was 16 years old, he was first found eligible for special education and related services under the IDEA.  Prior to this, he was receiving services under a 504 Plan.  When he was 17 years old, he was shot, which resulted in the removal of his appendix and large intestine and repair of an artery.

107. A.A. has been diagnosed with attention-deficit/hyperactivity disorder (ADHD), posttraumatic stress disorder (PTSD), oppositional defiant disorder, depression, and bipolar disorder.  He enjoys learning and, prior to incarceration, liked going to school.

### (b)  APER Failed to Timely Take Action to Provide A.A. with Needed Education and Services

108. After A.A. entered Young and expressed interest in education, APER failed to place him promptly in an educational setting suited to his needs and failed to adopt his previous IEP or develop a new IEP within 60 days.  It also failed to give him or his mother (who has served as his educational representative) notice of educational meetings consistent with the procedural requirements in the IDEA.

### (c)  APER Did Not Design A.A.'s March 12, 2021 IEP to Address His Needs

109. On March 12, 2021, A.A.'s IEP Team developed an IEP and appointed A.A.'s mother as his educational representative.  Despite having three years of data, APER did not use A.A.'s prior records in any meaningful way to identify appropriate assessments to conduct or develop his IEP.

110. Caitlin Devonshire, A.A.'s special education teacher and a DDOE employee that works for APER, testified that A.A.'s IEP "was designed the best that [APER] could do with the

---

students' information and identities.  On May 22, 2024, representatives of the Delaware Office of the Attorney General informed Plaintiffs' counsel that their office will not be the counsel defending this lawsuit.  Once counsel for Defendants enter appearances, Plaintiffs will provide those counsel with the names of the students marked as confidential pursuant to Local Rule 26.2.

resources that [APER] had" and that A.A.'s IEP was not "designed to meet his needs."[4]   Dawn Myers, the Educational Diagnostician at Young (a former DDOE employee that worked for APER) at the time, testified to the same.   A.A.'s "instruction" set forth in the IEP consisted almost exclusively of accommodations, contained no research-based instructional methods, and was not intensive enough to appropriately address A.A.'s needs.

111. The section of A.A.'s IEP that purports to describe his specialized instruction includes two parts, one devoted to "Behavior" and one devoted to "CEA3/Writing."

112. **Behavioral Needs.**  Prior IEPs for A.A. always included supports related to his myriad behavioral needs.  For example, A.A.'s April 2, 2020 IEP developed by an LEA other than APER identified his need for positive behavioral interventions and supports and included the following accommodations, modifications, and supports:

> Frequent check-ins, access to support and/or counseling staff when needed, frequent reinforcement of positive response and behavior, alternatives for completing assignments (typed, verbal, written), concise and direct prompts.  Allow [A.A.] to pace and walk in the back of the class quietly.  Use proximity when redirecting him and try non-verbal communication when possible and never address him in front of the entire class. He [responds] better to 1:1 redirect.  Use appropriate welcoming posture and proximity to ensure [A.A.] does not feel more anxious or verbally attacked.  Work with support staff to push in or pull and look for opportunity to check-in with [A.A.] after a[n] inappropriate interaction to reteach how he should address his concerns in a more appropriate way. . . . Direct instruction, modeling, and feedback in persevering through non-preferred or difficult tasks[.] . . . Preferential seating: frequent check-ins during instruction; chunking of assignments; modeling; provide information visually as well as orally; frequent conversations in regards to missed assignments; remove distractions from work area[.] . . . Direct instruction, modeling, and feedback in focusing on assignments[.]

---

[4] Statements such as this, more of which are described herein, came from the administrative proceedings (described further below) concerning APER's failure to provide A.A. (and other students described below) with FAPE.

113. Each IEP that A.A. had before arriving at Young was accompanied by a behavior support plan, which provided several accommodations and modifications to A.A.'s instruction and physical environment.  Beyond the items above, some of these measures included seating away from distractions or seating near positive peer models, breaks, being able to listen to music during independent work time, bi-weekly check-ins with the school psychologist, ability to take tests in alternate locations, and extended time as requested.  The behavior support plans also provided A.A.'s teachers with information and responses to help provide him with instruction on replacement skills and appropriate behavior, such as positive teacher praise, a reward system, and acknowledgement. Moreover, every prior IEP for A.A. included some sort of counseling or psychological related services, either as a related service or incorporated within the goals.

114. The March 12, 2021 IEP Team at Young did not consider adopting the behavior support plan which had, up to that point, provided A.A. with behavioral assistance.  Ms. Myers explained that APER does not implement behavior support plans because APER lacks the resources to provide the corresponding interventions.  She also explained that APER does not conduct functional behavior assessments and that those words never came up in the eight years that she worked there.  She further explained that "there was very little guidance or material or support in terms of being able to identify a behavior, assess it, and then come up with a plan to mediate it."

115. A.A.'s behavior goal and related supports provided in his March 12, 2021 IEP at Young is far more limited than what was provided in his prior IEPs.  It explains that "[A.A.] reports that he experiences frustrations leading to racing and/or obsessive thoughts every couple of days sometimes lasting all day"; that A.A. needs "Daily/Weekly check-ins, teacher provided journal and books when requested" to address "Behavior"; that he needs "One-on-one instruction" "1-5

times a week [for 15 minutes] as indicated by benchmark goals and student needs"; and that he

will work on meeting benchmarks with a goal to "redirect frustrations by working out, reading, or

journaling."

116. A goal to "redirect frustrations" is not a measurable goal, it was not tracked, and there

is no indication that anyone worked with A.A. to teach him how to recognize when his frustration

was rising to a level that required redirection.  Moreover, as the DDOE Special Education Due

Process Hearing Panel explained in the amended administrative decision issued on December 16,

2022:

> APER admittedly did not track [the benchmarks toward A.A.'s goal] at all, nor had
> they intended to.  When asked if anyone was keeping track of the benchmarks for
> this goal, [Ms. Myers] testified: "there would be no one that could keep track,
> really." . . . [N]o counseling was provided in the IEP because there was no onsite
> school counselor. . . . Additionally, . . . there was only one goal related to behavior.
> This goal would be nearly impossible for [A.A.] to achieve as there were no
> behavioral or counseling supports provided through the IEP.

117. During the March 12, 2021 IEP Team meeting, A.A.'s mother shared her concerns

about his need for mental health services. Because APER does not employ staff to provide

counseling or psychological services to students, Ms. Myers told A.A.'s mother that she would

reach out to "mental health," but that APER has "no control over the mental health."  Even though

APER was aware of A.A.'s need for related services to address his behavior, nobody was included

in the IEP Team to address those needs.

118. When A.A. was incarcerated at Young, mental health services were provided by

Centurion through a contract with the DDOC.  There was generally little to no coordination

between APER and Centurion regarding related services for students aged 18 and over.  Although

A.A. did eventually get mental health services started with Centurion, the services were separate

and apart from his special education, and none of the information about the services was shared

with the APER staff working directly with A.A.  In fact, Ms. Devonshire only found out that A.A.

was receiving services from Centurion by happenstance when she and the Centurion provider arrived at A.A.'s housing unit at the same time.

119. Both Ms. Devonshire and Ms. Myers testified that related services in the form of counseling or psychological services should have been included in A.A.'s IEP. Ms. Devonshire did not raise that at A.A.'s IEP meeting because it "wasn't the practice" within APER that students with significant mental health needs had related services coordinated with Centurion through their IEP.

120. Once A.A. connected with Centurion and began receiving short-term art therapy, Ms. Devonshire shared that he:

> seemed to become more positive afterwards, he was much more flexible in terms of his expectations. He was more agreeable, he was more positive, he laughed more, was a lot more cheerful even in adverse circumstances. Because things have happened to him in the facility that I think before that intervention, he would have been very thrown off by, and following that intervention, I did see a change in him . . . I saw him change more toward the positive.

121. **CEA3/Writing.**   The second goal in A.A.'s March 12, 2021 IEP related to "CEA3/Writing."   This section identifies certain issues regarding A.A.'s writing and includes benchmarks with a goal for A.A. to ultimately "edit and revise his research based argument essay of at least 6 paragraphs, to include an introduction, at least 3 point paragraphs, 1 counter argument and rebuttal paragraph, and conclusion [and to] score at or above grade level in each of the 5 paragraphs according to the approved CEA3 writing rubric."   To do this work, the IEP states that A.A. will need as accommodations "Graphic Organizers, checks for understanding, breaks in instruction, as-needed use of writing frames, modified assignments (including but not limited to length requirements), use of a computer, use of grammar/spelling checker, use of grammar 'cheat sheets' and notes, teacher assistance planning and editing."   Under that item, it states, "One-on-one instruction" "2 times a week" for "20 minutes."

122. Writing was a relative strength for A.A.  The decision to include the CEA3 as a goal in A.A.'s IEP was based on a directive from members of APER staff who serve as readers/graders or have senior roles in the CEA3 process, but who were not part of A.A.'s IEP Team.  It was not based on the informed judgment of the IEP Team after consideration of A.A.'s individual needs.

123. **Other issues.**  APER never considered A.A.'s need for extended school year services.

124. APER never considered A.A.'s need for physical education, nor did it ever provide A.A. with physical education.

(d)   **APER Did Not Provide A.A. with Education in the Least Restrictive Environment**

125. When A.A. was at Young, the only environment available to pre-trial detainees was education without any peers.  As a result, for over 400 days, APER provided education to A.A. as self-study on his own with limited individual instruction.  Receiving education without any peers is the most restrictive environment.

126. Ms. Myers testified that A.A. would have benefited from instruction in a group setting and that being in a larger setting would have provided him with the opportunity to see the behavior of peers and receive positive feedback when engaging in appropriate behaviors.

127. A.A.'s March 12, 2021 IEP states: "Placement is court mandated.  [A.A.] is housed on the West Side of the facility.  Security can restrict a student's access to general education services and materials based on changes in housing and security concerns."  APER has failed to address A.A.'s least restrictive environment for education and has conflated the student's living environment with their educational placement.  As the DDOE Special Education Due Process Hearing Panel explained, "[t]he 'placement' mandated by the court was for [his] residence (prison), not a learning environment."

**(e)   APER Failed to Provide A.A. with Any Meaningful Education at Young**

128. At Young, A.A. received at most three days of education per week, for up to 45 minutes per day.  For some months, he was only seen once in the month for 45 minutes.

129. APER never provided A.A. with a class schedule.  As a result, he would miss his education sessions because he was either not prepared (for example, he did not have the chance to shower or get himself ready), was being visited by others, or was visiting the commissary.  If APER had provided A.A. with a schedule, he would have been able to plan around his education.

130. While detained on the West Side of Young, A.A.'s individual educational sessions were conducted in an interview room that is divided by a thick layer of plexiglass.  His side of the room was approximately three feet by three feet.  His teacher was also in a similarly sized room on the opposite side of the barrier.  A.A.'s side did not have a table, so he needed to hunch over to use his leg as a table.

131. A short time after he was sentenced, A.A. was relocated to Q Pod, the "education unit" for sentenced individuals, where he was to be provided two hours of educational programming five days a week.  However, he was only able to spend approximately one week there due to behavioral incidents resulting in part from APER's failure to provide him with needed counseling and other related services.  He was repeatedly transferred to the restrictive housing unit due to behavioral issues.  In the restrictive housing unit, A.A. received, at most, 45-minute individual education sessions as described in paragraph 128 above.  The only difference was, in the restrictive housing unit, he had access to a table on his side of the plexiglass barrier.

**(f)   APER Failed to Provide A.A. with Needed Accommodations During the CEA3 Process**

132. A.A. worked on his CEA3 argument paper for at least six months and finished it in late December 2021.  However, Ms. Myers and Ms. Devonshire did not submit it for grading

because they did not believe that the CEA3 graders would honor the accommodations that had been provided in accordance with his IEP.  Their concern arose in part due to the fact that one of APER's CEA3 graders had stated: "if a student can't pass without accommodations, he shouldn't pass at all."  Because the CEA3 was not submitted or graded, A.A. received no credit for his six months of work.

### (g)    APER Failed to Perform a Timely Reevaluation or Annual IEP Reviews

133. A.A. was due to be reevaluated in December 2021.  APER sought and received A.A.'s consent to reevaluate him in February 2022, but it then failed to meet to determine his continued eligibility until November 18, 2022, after he was transferred to another DDOC facility, and 11 months after the eligibility determination was due.  Although APER has held several IEP Team meetings since November 18, 2022, he did not have a finalized IEP until February 1, 2024, almost three years since his March 12, 2021 IEP.

### (h)    APER Failed to Provide A.A. with Any Meaningful Education at Vaughn

134. A.A. was transferred to Vaughn on July 18, 2022.  APER did not hold an IEP Team meeting to discuss this change in placement or the impact that it would have on his education.  In fact, despite its obligation to do so, APER never held IEP Team meetings when there was a change in A.A.'s placement.  Neither A.A. nor his mother were notified of the impact that the transfer would have on A.A.'s education.

135. A.A. did not begin receiving education at Vaughn until August 17, 2022.  Between August 17 and September 5, 2022, APER offered an education session to A.A. only once per week or not at all.  This increased slightly as A.A.'s Special Education Due Process Hearing (an administrative trial under the IDEA) approached.  The week before the Hearing, APER offered A.A. guided self-study for two 2.5-hour sessions per day on two separate days (totaling 10 hours of offered education).

43

136. Solely because A.A. is housed in the SHU at Vaughn, when he attends educational sessions, he is shackled to his desk with his arms shackled to his body.  He is unable to get up and walk around as needed.  As the DDOE Special Education Due Process Hearing Panel explained, "Given the fact that [A.A.'s] prior IEP included an accommodation to allow [him] 'to pace and walk in the back of the class,' it is surprising that APER accepted a three-by-three room, or a larger room which required Student to be shackled to a desk, with [his] hands shackled to [his] body, as the [least restrictive environment] for anyone with [A.A.'s] identified disabilities."

137. APER staff stated at the November 18, 2022 IEP Team meeting at Vaughn that A.A. does not need counseling or psychological services.  However, APER had years of evidence regarding A.A.'s ongoing need for those related services.  APER's incorrect conclusion that A.A. did not need counseling or psychological services was refuted by two of its own contracted evaluators.

> (i)   **APER Never Made a Manifestation Determination, Conducted a Functional Behavioral Assessment, or Developed a Behavior Support Plan**

138. As described above, A.A. has had numerous behavioral incidents that resulted in transfers to the restrictive housing unit at Young.  Even after his transfer from Young to the SHU at Vaughn for disciplinary infractions, A.A. continued to struggle with his behavior.  For example, at Vaughn, in early May 2023, A.A. was involved in an altercation with another individual and received a sanction which removed all privileges—no access to commissary, no more than one phone call per month, and an impermissible interruption in his educational programming.  APER has never made any manifestation determinations for A.A. and has never conducted a functional behavior assessment or developed a behavior support plan for him.  Had APER provided A.A. with the services and supports for his behavioral needs, it is probable that those incidents either

would not have occurred or, at a minimum, that A.A. would have been equipped to handle them better.

> **(j)  APER Refused to Provide A.A.'s Education Records to His Counsel or His Educational Representative**

139. On or around April 2022, APER instituted a new practice whereby attorneys and educational representatives cannot receive a student's educational records even where the student has provided the required consent.  On information and belief, this practice was instituted in retaliation against several students, including A.A., who had sought legal assistance from CLASI at the time.  APER refused to provide copies of A.A.'s records to CLASI (which represents A.A.) or to his mother, who has served as his educational representative.  Instead, APER provided A.A. with copies of his education records and told him he could "provide them to whoever he wished."  This created at least two problems.  First, inmates have nowhere to securely place their records.  The information is accessible to cellmates and anybody else who enters the cell, including DDOC staff conducting cell checks.  Second, inmates often do not have the money to mail records, especially a large volume of records, to their educational representatives or counsel.  The DDOE Special Education Due Process Hearing Panel described this as follows:

> We need not provide hypotheticals to demonstrate the potential absurdity, as the matter before us is illustration enough.  Here, Student, an incarcerated disabled student, who was determined by the IEP Team to lack sufficient capacity to make [his] own educational decisions, was the only one given copies of [his] records, believing Student "was able to provide them to whoever he wished."  Tr. 100.  It is unconscionable that APER provided education records in an unsecure manner to an incarcerated student, who they had determined lacked capacity to make educational decisions, who had no privacy, while simultaneously refusing to provide those records to Student's educational representative or [his] attorney under the guise of being prohibited from doing so by the privacy rights required by FERPA [the Family Educational Rights and Privacy Act].  Therefore, **we find** that Mother was appointed as Student's Educational Representative, and as such was entitled to receive a copy of [his] records, and APER's refusal of same was a deprivation of FAPE.

**(k)   APER Disregarded the Fact that A.A.'s Mother is His Educational Representative**

140. APER has done much to stymy the involvement of A.A.'s mother in his education, even though she is his educational representative.  This includes failing to alert A.A.'s mother to the first IEP Team meeting held by APER or to send her a draft IEP for review; failing to involve or even contact her regarding an offer of compensatory education in September 2021 (and at the same time asking A.A. to waive his right to compensatory education); failing to provide her with regular progress monitoring of A.A.'s goals and benchmarks; failing to obtain her consent for the triennial evaluation in February 2022; failing to provide her the opportunity to be involved in the decision-making process related to A.A.'s least restrictive environment, educational program, or the provision of any related services; and disregarding her request for A.A.'s education records and the subsequent failure to provide them to her.  These failures significantly impeded her opportunity to participate in the decision-making process and impeded A.A.'s access to FAPE.

**(l)   APER Violated Procedural Protections Requiring Involvement of A.A. and His Mother in Educational Decision-Making**

141. In violation of mandatory notice requirements designed to allow for preparation and family participation, A.A. was only invited to his February 11, 2021 and September 23, 2021 IEP Team Meetings on the same day and at the same time that those meetings took place.  The notices regarding those meetings (and other notices that APER provided to A.A. and others when APER took certain actions) failed to include required information such as who would participate in the meetings, the right to request the participation of others, a description of options the IEP Team considered and rejected and the reasons why, a summary of procedural safeguards, the right to request records, and sources to obtain assistance in understanding the law.  No invitation or notice was ever provided to A.A.'s mother concerning either meeting, and APER never sought her input.

**(m)  The DDOE Special Education Due Process Hearing Panel Found Numerous Violations of the IDEA**

142. Through A.A.'s mother, A.A. filed a Due Process Complaint on August 1, 2022.  A hearing was held.  The DDOE Special Education Due Process Hearing Panel found that "APER failed to create an IEP that was designed to provide Student with a FAPE"; "APER failed to respond to [A.A.'s] behavioral and emotional needs related to [his] disabilities and therefore deprived [him] of a FAPE"; "APER failed to provide special education and related services to [A.A.] in the least restrictive environment"; and "APER engage[d] in procedural violations of the IDEA which resulted in a deprivation of FAPE" by "fail[ing] to either adopt the previous IEP or develop a new IEP within 60 days of [A.A.'s] entry to the prison system," "fail[ing] to conduct a reevaluation of [A.A.] in a timely manner," "fail[ing] to engage [A.A.'s] designated Educational Representative in [his] education," and "refus[ing] to provide copies of [A.A.'s] educational records to [A.A.'s mother] or [CLASI]."

143. In terms of relief, the Hearing Panel stated:

> APER's own testimony as to lack of resources, lack of staff, and other logistical and physical barriers make it clear that [A.A.] will not be able to receive a sufficient amount of compensatory education in addition to the appropriate education to which [he] is entitled.

The Hearing Panel concluded that A.A. was deprived of 1,892 hours of education, which it calculated to be worth $141,900.  The Hearing Panel ordered APER to "immediately provide a full copy of [A.A.'s] education records" to A.A.'s mother and CLASI, "immediately hold an evaluation planning meeting with [A.A.'s mother] to determine appropriate independent evaluations to be conducted," "pay for any and all independent educational evaluations determined to be appropriate," "[u]pon receipt and review of the evaluations . . . contract with a mental health service provider to provide the services recommended by the psychiatrist who evaluated Student," "develop an IEP based on the findings and recommendations in the other IEEs [Independent

Educational Evaluations]," and "place $141,900 into a compensatory education fund for the benefit of Student."

      **(n)   Subsequent Events**

144. Despite the findings and relief ordered by the DDOE Special Education Due Process Hearing Panel, A.A. continues to be denied FAPE.   APER has not complied with the Hearing Panel decision—it has not provided A.A. with the vast majority of the relief that it has been ordered to provide.   As a direct result of APER's actions, A.A. is continuing to suffer irreparable harm, including lost educational opportunities.   In early 2023, two of APER's contracted evaluators, Kristin Herzel, Ph.D., and Sarah Campbell, Ed.D., administered assessments to A.A. and concluded that he required counseling and psychological services. Dr. Herzel remarked that A.A. is "temperamentally impulsive and has a strong tendency, no doubt, due at least in part to his experiences, to assume that others mean him harm," and that he has trouble getting along with others and managing frustrations.   At A.A.'s June 22, 2023 IEP meeting, Dr. Herzel and Dr. Campbell shared that A.A. needs ongoing counseling and psychological services to access education.   Specifically, they shared that A.A. would benefit from cognitive behavioral therapy, direct instruction in mindfulness, and direct instruction in functional communication, which would assist A.A. in being able to express his emotions.   APER did not commit to providing these related services and merely stated that APER was exploring whether related services would be provided.

145. When Dr. Campbell met with A.A., she indicated that she would be seeing him on an ongoing basis for services.   A.A. only saw her once.   Then, in July 2023, APER contracted with a second psychologist, Ms. Laura DaSilva.   A.A. built up a good rapport with Ms. DaSilva and felt as though he was gaining traction with the counseling.   However, Ms. DaSilva abruptly stopped meeting with A.A. in the beginning of August 2023.   APER did not notify A.A. or his mother that

services were beginning or ending.  At A.A.'s February 1, 2024 IEP meeting, APER stated that they have not found a mental health provider to work with A.A.

146. The experiences with Dr. Campbell and Ms. DaSilva caused A.A. to withdraw and become wary of sharing his thoughts and emotions if and when APER again provides A.A. with the counseling or psychological services required by his IEP.  This has had and will continue to have a devastating impact on A.A.'s mental health progress.

147. As of the date of this filing, APER is still not providing counseling or psychological services to A.A. that are required by his IEP.  He has not received the related services he needs and to which he is entitled.  APER's failings have resulted in A.A. suffering, among other things, educational deficits, significant time in restrictive housing and other sanctions, not being allowed to talk with family, anxiety, depression, and dignity harms such as feeling less than and of wanting to give up.

148. APER filed a complaint in this Court to appeal the order of the Hearing Panel.  In response, CLASI filed a counterclaim on A.A.'s behalf, raising claims for violations of the Rehabilitation Act and the ADA.  Those civil rights claims could not be raised before the Hearing Panel.  That case is pending in this Court under civil action number 22-1615.

**2.  B.B.**

    **(a)  Background**

149. B.B. was born in 2001.  He experienced substantial instability throughout his childhood.  His mother was murdered when he was six years old.  Thereafter, he moved between living with his maternal aunt and with his father and stepmother, and for a period of time, he lived alone.  He has ADHD, PTSD, oppositional defiant disorder, and a specific learning disability.  He was first found eligible for special education and related services on November 7, 2010.

150. B.B. and his teachers have for years identified issues regarding attention to task and difficulty with focus. He has had difficulty completing assessments and comprehending, synthesizing, and summarizing complex concepts. He needs to learn through class discussions and requires structured guidance in writing. That said, B.B.'s teachers have long acknowledged his work ethic, his drive to move forward toward goals, and his willingness to work together with his peers. B.B. likes learning, particularly hands-on learning. B.B.'s English teacher, prior to his incarceration at Young, explained in his 2018 IEP:

> [B.B.] is always on task and gives his best effort with each assignment. He volunteers to read and when we discuss the text or our different responses to the text, [B.B.] participates in the discussions and shares his own responses. [B.B.] puts much effort into his writing. He usually shares his writing with me for feedback, and when I make one or two suggestions, he is always willing to [go] back to his work and make edits to improve his writing. In two summary writing assignments, [B.B.] scored an 8/10 and a 9/10. Some of the accommodations [B.B.] has received include: text read aloud, extra time to complete assignments, teacher assistance with comprehension and editing responses, use of a highlighter, graphic organizers, class discussions, key words highlighted, video support, class brainstorming to support writing, sentence starters, previewing vocabulary, and writing rubrics. [B.B.] is always respectful to the teacher and it is enjoyable to have him as a student. His work ethic makes him a good role model to the other students in the ELA [English Language Arts] classroom.

**(b)   APER Failed to Take Timely Action to Provide B.B. with Needed Education and Services**

151. Nine days after B.B. entered Young on January 5, 2021, he signed a form indicating his interest in education. APER did not provide B.B. with any special education until March 5, 2021. B.B.'s first IEP Team meeting at Young took place on March 5, 2021. Because B.B. was not provided advance notice of the meeting, at the beginning of the meeting, he requested that his aunt attend the meeting. B.B's aunt was not invited and APER held the meeting anyway.

152. Not all assessments that B.B. needed were conducted around that time. APER did not adopt or meaningfully work from B.B.'s prior IEP while developing a new one.

### (c)   APER Did Not Design B.B.'s March 5, 2021 IEP to Address His Needs

153. B.B.'s March 5, 2021 IEP includes provisions on instruction and goals regarding reading, math, and CEA3.

154. **Reading.**  To be able to answer reading comprehension questions with 80% accuracy by the end of a year, B.B. was to be educated twice a week for 30 minutes, alone with his teacher, with the following supports: "Graphic Organizers, checks for understanding, summarizing during reading, as-needed thesaurus/dictionary, pre-teach vocab, use of notes, extended time, chunking information, repeating directions, [and] read alouds when requested."  B.B. often received less than one hour per week of specialized reading instruction, although that instruction is better characterized as self-study with some guidance.  When B.B.'s teacher would see him for sessions, he was given the choice between working on course work toward credits for his diploma or on specialized instruction described in his IEP.

155. **Math.**  To be able to solve algebraic equations with 75% accuracy by the end of a year, B.B. was to be educated alone three times a week for 30 minutes, with the following supports: "use of a calculator, use of notes, security approved manipulatives, extended time, scaled questioning, multiple-choice options with or without elimination, [and] use of multiplication chart."  At least until January 2022, B.B. received no math instruction from APER, either general or specialized, because APER did not enroll him in a math course.  Because APER failed to provide any math instruction whatsoever, B.B. did not meet his benchmarks for his math goal.  After January 2022, B.B. received less than 1.5 hours per week of math guidance.

156. **CEA3.**  The third goal in B.B.'s March 2021 IEP includes accommodations related to B.B.'s CEA3 portfolio.  As described below, these accommodations were effectively rejected, which meant that B.B. received no credit after he completed his work.

157. Even though APER should have been aware of B.B.'s needs for mental health and related supports based on his prior education records, no one at the IEP Team meeting specifically addressed those needs, behavioral goals were not considered, and no corresponding related services (or any related services) were included in the IEP.

158. The "instruction" set forth in the IEP consisted almost exclusively of accommodations, contained no research-based instructional methods, and was neither intensive enough to appropriately address B.B.'s disability-related needs nor was it based on his demonstrated needs.

159. There were many further deficiencies, including the failure to seek B.B.'s input prior to the IEP meeting, the failure to base the IEP on sufficient data, the use of vague and unmeasurable goals and objectives which did not address all areas of B.B.'s needs, and the failure to include needed goals and related specialized instruction that were included in his prior IEPs. At B.B.'s special education due process hearing, Ms. Myers and Ms. Devonshire testified that B.B.'s IEP did not meet his needs, did not provide him with FAPE, and would not allow him to make reasonable progress toward a high school diploma. Ms. Myers also explained that the IEP Team "largely determined [the amount of time that would be provided for each goal] based on the resources [that APER] had." Nicole Coady, the Teacher/Supervisor[5] at Young at the time (and an APER employee), testified that the IEP was not carefully prepared and lacked individualization.

160. The DDOE Special Education Due Process Hearing Panel that adjudicated B.B.'s administrative claim described these failures in its March 7, 2023 decision as follows:

> Here, **the Panel finds** that the March 5, 2021 IEP was not an offer of FAPE. If a student's IEP must be reasonably calculated to ensure academic progress, that calculation must include a summation of all relevant factors impacting a student's ability to learn and progress. We find that the March 5, 2021 [IEP] falls short of

---

[5] The Teacher/Supervisor is akin to a principal with additional teaching responsibilities.

this standard – and the calculation includes far too many unknowns.  In 2016, [B.B.] was evaluated and noted to have significant cognitive deficiencies in attention, concentration, and visual memory.  [B.B.'s] ESR [Evaluation Summary Report] revealed [he] struggled with reading comprehension, mathematics calculation, and written expression.  The March 5, 2021 IEP has very few data considerations and the source of the PLEPs [Present Levels of Educational Performance] is unclear.  Further, witness testimony underscored the notion that the IEP was not created with [B.B.'s] specific needs in mind.  Multiple sections of the IEP are left blank, marked "N/a," or set forth irrelevant and outdated information.  There are no goals or accommodations related to [B.B.'s] documented distractibility and ADHD diagnosis.  There are no related services offered.  The IEP does not take into account [B.B.'s] input – particularly concerning [his] distractibility and difficulty focusing.  The CEA-3/writing goal appears to have been included in light of the significant barriers [B.B.] would face completing the portfolio project without accommodations.  The Panel finds that the March 5, 2021 IEP was not reflective of [B.B.] in any unique way and was not subjectively designed to offer [him] a FAPE.

### (d)    APER Did Not Design B.B.'s July 18, 2022 IEP to Address His Needs

161. The IEP Team developed a new IEP for B.B. at the July 18, 2022 IEP Team meeting. That IEP also failed to meet B.B.'s needs or provide him with FAPE.

162. By the July 18, 2022 IEP Team meeting, APER had still failed to conduct all assessments to which B.B. had consented and conducted some assessments to which B.B. had never provided informed consent.

163. While the IEP Team kept math and reading goals in the new IEP, it refused to accept many of the accommodations and modifications proposed by Ms. Devonshire, who was the special education teacher who primarily worked with B.B and the only member of the IEP Team who had knowledge of B.B.'s educational needs.

164. The Hearing Panel explained that many of the failures from the March 5, 2021 IEP continued, or worsened:

The **panel finds** that the July 18, 2022 IEP was not an offer of FAPE. . . . [T]he IEP must be a reflection of a student's subjective educational needs – not boilerplate, cut-and-paste, or generic language.  Unfortunately, the Panel finds that the July 18, 2022 IEP was exactly that: a regurgitation of the March 5, 2021 IEP – with even *less* to offer than its predecessor.  To begin, data considerations included the results of the TABE 11/12, which indicated partial proficiency in all areas of

reading and math.  Instructors familiar with [B.B.'s] strengths and weaknesses opined that [B.B.] needed assistance in reading comprehension, writing, and attention/focus.  The CEA3/writing goal was removed, and the evidence submitted to the Panel does not indicate a justification for this decision.  There was no PLEP [Present Levels of Educational Performance] noted in [B.B.'s] math problem-solving goal, which indicates that the goals and benchmarks were determined arbitrarily without solid data inputs to determine [B.B.'s] starting point.  There was, again, no attention-to-task or other focus-related goal or accommodation noted in any area of the July 18, 2022 IEP despite input from [B.B.], teachers, and data considerations that this is an area of struggle for [B.B.].

165. Furthermore, at B.B.'s 2022 IEP meeting, Dr. Julia Webster, an APER staff member in attendance, who had never worked with B.B., asked how B.B. could be considered a "true scholar" if he required accommodations and modifications to the curriculum.  Maureen Forde-Whelan attended this meeting and did not object to Dr. Webster's comments; instead, she nodded in agreement.  Referencing Dr. Webster's "true scholar" comment and other issues, the Hearing Panel stated:

> Lastly, the Panel is profoundly concerned with the decorum of the July 18, 2022 IEP meeting wherein the team discussed this proposed IEP.  The comments made by those tasked with upholding [B.B.'s] special education rights underscore this Panel's finding that this plan was made in haste with no genuine effort to craft an education pathway reasonably calculated to meet this specific Student's needs – a student described as one eager to learn, ambitious, motivated, and scholarly.

166. After the July 18, 2022 IEP meeting, the IEP Team agreed to gather more data and reconvene in August or September 2022 to review any further data and assess whether to include a writing goal, a behavioral goal for focus and executive function, and an additional math goal for algebraic calculations.  APER did not hold another IEP meeting for B.B. until June 26, 2023.  At that meeting, the IEP Team agreed that B.B. was eligible for extended school year services due to the fact that he had only earned 2.5 credits toward his high school diploma, despite being enrolled in education at Young for more than two years.

167. On November 6, 2023, APER held an IEP exit meeting for B.B., who had turned 22 in August 2023 and aged out of services.  On his final progress report, he did not meet his math

computation goal.  No additional evaluations had been conducted and no additional data had been collected since the June 26, 2023 meeting.

> **(e)   APER Failed to Provide B.B. with Needed Accommodations During the CEA3 Process**

168. As with A.A., Ms. Myers and Ms. Devonshire never submitted B.B.'s CEA3 paper due to concerns that the APER screeners would not accept his accommodations.  Ms. Myers believed that the screeners would immediately return a paper when it did not meet the typical standards for pages or source number requirements.  B.B., Ms. Myers, and Ms. Devonshire expressed additional concerns because the APER staff person who made disparaging comments about B.B. during his July 18, 2022 IEP Team meeting is one of the graders for the CEA3.

169. APER's failure to develop an appropriate process for approving accommodations and modifications for the CEA3 paper set B.B. further behind in his progress toward his high school diploma and caused him to spend months of his limited remaining time before aging out of eligibility for special education services on a project for which he did not receive high school credit.  On this topic, the DDOE Special Education Due Process Hearing Panel stated:

> The CEA-3 evidence and testimony is particularly impactful upon the Panel's finding on this issue [the denial of FAPE].  [B.B.] was navigating academia notwithstanding several disabilities.  [He] has difficulty with reading comprehension, writing, and attention-to-task.  [He] is in a penal setting.  [His] barriers to academic success are heightened as compared to peers.  The CEA-3 was an opportunity for [B.B.] to make progress toward [his] goal of graduation.  [He] *completed* the writing portion of the process – despite well-documented difficulties in written expression and focus.  Yet, the Panel was not presented with any evidence as to feedback on [B.B.'s] first draft, how [he] fared on the first editorial review, how [he] did on the re-write, [his] grade on the final version, or the number of credits [he] earned as a result of [his] efforts.  Reason being, [B.B.'s] CEA-3 paper was never acknowledged by anyone but [Ms. Devonshire], was never graded, was never counted towards [his] overall credits, and amounted to – quite frankly – a waste of [B.B.'s] time.  Moreover, APER opted midstream to remove the CEA-3 from [B.B.'s] IEP, amend its policies with regard to accommodations on the CEA-3 for special education students, and ultimately manifested such a condemnation of [B.B.'s] attempts on this portfolio project that he was never able to actually achieve any forward momentum whatsoever – despite having put in the work.  Given that

the CEA-3 was a component of [B.B.'s] March 5, 2021 IEP – and should have remained on his July 22, 2022 IEP – the Panel finds a clear violation of FAPE on this issue on the part of APER and an inexplicable introduction of unnecessary and superfluous barriers against [B.B.] by APER at the expense of up to 10 credits toward his graduation. The Panel finds this unacceptable.

### (f)   APER Did Not Provide B.B. with Education in the Least Restrictive Environment

170. B.B.'s IEP Team never determined B.B.'s least restrictive environment.  During the hearing, APER staff testified that IEP Teams did not make individualized determinations of the least restrictive environment in B.B.'s IEP or in any IEPs.

171. APER made B.B.'s educational placement decision based on his housing assignments determined by DDOC, without any individualized determination of whether security needs could be accommodated with a less restrictive placement.

172. On the West Side at Young, when B.B. was a pre-trial detainee and when he was sent to restrictive housing after being sentenced, B.B. did not have access to any general education and he was not educated with any other students.

### (g)   APER Failed to Provide B.B. with Any Meaningful Education on the West Side of Young

173. B.B. and other students in his West Side housing unit only received instruction in a one-to-one setting and that education totaled approximately 30-45 minutes a day, at most three days a week.  However, APER was too short-staffed to always provide education to every student, even based on this limited schedule.  APER staff testified that they relied on students refusing education because they would not have been able to see every student they had scheduled on any particular day.  Moreover, the education that was received by B.B. came through plexiglass in the same cramped and uncomfortable interview room without a table that is addressed above (para. 130) regarding A.A.  On this topic, the DDOE Special Education Due Process Hearing Panel wrote:

The record reflects that APER staff struggled to meet the instructional time needs of detained students on the West Side – implying that [B.B.] was not the only student receiving education services while detained. Yet [B.B.] was expected to learn and progress in a one-on-one setting, in a box-like interview room, with no desk, and a Plexiglass partition as the only modality of written communication and instruction between [B.B.] and instructor. It is unclear why a group education setting alongside other detainees receiving services was not possible. It is also unclear why the detainee education setting does not allow for a student to have a desk. [B.B.] and instructors expressed frustration and discomfort with the setting. One instructor actually learned to write backwards to implement the Plexiglass divider as a makeshift chalkboard. Here, the **Panel finds** that placement of [B.B.] in a one-to-one educational setting without the provision of bare minimum tools one needs to participate in instruction is a violation of the least restrictive environment mandate and a violation of [B.B.'s] right to a FAPE for the period spanning January 2021 through March 2022.

### (h)   APER also Failed to Provide Required Education on the East Side of Young

174. After he was sentenced in March 2022, B.B. was transferred to the East Side of Young. APER did not hold an IEP Team meeting to discuss the change in placement prior to that move or at any time after, despite the fact that his change in housing impacted the provision of educational services.

175. B.B. initially studied in a small group setting with his teacher and a few other students. He had access to education five days a week instead of three. However, in June 2022, B.B. was moved to Q Pod. *See* paras. 92, 131 above.

176. On information and belief, until around the middle of December 2022, there were about sixty students on Q Pod at any one time. Students on Q Pod received some form of educational programming throughout the day, five days a week, although, as described herein, it bore little resemblance to a typical high school education or other education. Their day began with a period of self-study that lasted approximately one hour and fifteen-minutes. Teachers assisted students as much as possible; however, the teachers were mainly there to ensure students were actively working. The morning session was followed by a "study group period," where students

were supposed to continue with their schoolwork.  However, it was more of a free period with students permitted to make telephone calls, go out to the courtyard, or do other similar leisure activities on Q Pod.  Then, the students would have lunch for approximately one hour before having another self-study session in the afternoon, with a teacher present, and a final self-study session in the evening. All told, there was very little, if any, instruction.  As of the middle of December 2022, students pursuing a high school diploma received the same little, if any, instruction, but were in a classroom setting near Q Pod.

177. The learning environment on Q Pod is loud, distracting, and sometimes chaotic.  Ms. Devonshire described Q Pod as a "big open room made of cinderblocks and [where] every sound echoes off every other sound."

178. At first, B.B. was pulled out of this environment for about one hour each morning to receive specialized instruction with other special education students in a separate classroom, and he also received one hour of specialized instruction in the open room in the afternoon.  This was highly beneficial to him.  However, the next business day following the September 2, 2022, pre-hearing conference before the DDOE Special Education Due Process Hearing Panel, APER abruptly and without notice or an IEP Team meeting ended the morning small group pull-out.  On information and belief, this action was taken in retaliation against B.B. and other students seeking legal assistance from CLASI and filing complaints.  Thereafter, B.B. struggled because of the lack of instruction and the loud, distracting environment.  Two months later, Ms. Devonshire was unavailable for those afternoon sessions, which eliminated any opportunity for special education.  Addressing this change, the DDOE Special Education Due Process Hearing Panel found the following:

> The Panel finds that the cessation of small group work was a violation of FAPE as applied to [B.B.].  The record reflects that [B.B.] was thriving in the small group

setting with Ms. Devonshire and had acclimated to a peer group with whom he was able to apparently overcome any attention-related issues and distractibility. Small group instruction was promised to [B.B.] on his IEP. [B.B.] communicated that he felt supported in this arrangement. Yet, for reasons that remain unclear, APER found it necessary to discontinue [B.B.'s] small group learning opportunity in December 2022 and [B.B.] had to return to the "arena" style Q-Pod learning environment.

179. Moreover, while Ms. Devonshire was unavailable due to a suspension from duty beginning in December 2022, APER staff encouraged B.B. and other students to cease pursuing a high school diploma, where they would receive the limited special education described herein, and instead pursue a GED, for which APER would not provide any special education. B.B. made the switch to pursue a GED. APER did not schedule an IEP meeting to allow B.B. to make an informed decision on this topic.

180. APER never considered B.B.'s need for physical education, nor did it ever provide B.B. with physical education.

> **(i)  APER's Failures Contributed to B.B.'s Behavioral Issues and APER Never Made a Manifestation Determination, Conducted a Functional Behavioral Assessment, or Developed a Behavior Support Plan**

181. B.B. was disciplined on multiple occasions at Young. APER never made a manifestation determination, conducted a functional behavior assessment, or developed a behavior support plan.

> **(j)  APER Refused to Provide B.B.'s Education Records to His Counsel**

182. As with A.A., APER refused to provide copies of B.B.'s education records to his counsel, CLASI, despite B.B. providing his consent for APER to do so.

> **(k)  APER Retaliated Against B.B. After He Exercised His Rights**

183. As addressed above (para. 178), the next business day following the September 2, 2022, pre-hearing conference before the DDOE Special Education Due Process Hearing Panel, APER abruptly and without notice or an IEP meeting cancelled B.B.'s small group instruction

time.  When B.B. asked Amanda Smagala, the Teacher/Supervisor at Young, why his placement had changed, she only told him that she would "talk to [him] later."  During his special education due process hearing, Ms. Smagala testified that she ended the small group because Ms. Devonshire added the small group without permission and that B.B. and the other students were getting extra time that other students were not getting.  When B.B. asked the director on Q Pod for a rationale for the change in his schedule, he was told he would be written up for disciplinary action if he asked again.  At Young, a write-up could mean anything from loss of privileges, to being locked in the cell, to even solitary confinement.

184. In addition, approximately one month after CLASI requested copies of B.B.'s education records in April 2022, APER changed its policy to prohibit disclosure of records to an individual or entity other than the student, even with a valid release of information.

### (l)   Numerous Other Procedural Violations Deprived B.B. of FAPE

185. The list of APER's procedural flaws is long and many have already been addressed above.  The DDOE Special Education Due Process Hearing Panel found violations for failing to promptly prepare and implement an appropriate IEP upon entry to Young; failing to timely re-evaluate B.B.; failing to observe B.B. in his educational setting and perform appropriate assessments; failing to include B.B.'s aunt, who was B.B.'s parent as the term is defined in the IDEA, in the initial meeting to determine capacity for decision-making; failing to provide required notices; and failing to provide B.B. with a draft of his IEP and to elicit his input as to the final version.  The following are additional procedural violations: APER failed to timely evaluate B.B. after he expressed his interest in participating in education; APER assessed B.B. in areas in which he had not provided informed consent; APER failed to assess B.B. in areas to which he had consented; no IEP meeting was conducted when B.B. moved between different educational placements within Young (this includes changes from one-to-one instruction, to a small group of

special education students, to an inclusive setting (a setting with students without disabilities), to an inclusive setting with a small group pull-out, and then back to the inclusive setting, all of which would require different educational considerations)[6]; and B.B. was taught by an instructor who lacked special education certification for approximately five months.  APER's myriad failures caused B.B. to receive virtually no educational benefit during his time at Young.

> **(m)  Altogether, the DDOE Special Education Due Process Hearing Panel Found Numerous Substantial Violations of the IDEA With Respect to B.B.**

186. In summary, the DDOE Special Education Due Process Hearing Panel explained that it found a "combination of various procedural violations, insufficient special education programming, and – but for Student's time on the East Wing and in small group within Q Pod – systemic violations of [B.B.'s] right to a least restrictive environment."  Accordingly, the Panel ordered the "[e]stablishment of a special education trust for the benefit of [B.B.] in the amount of $139,965.00" to be used "for educational or vocational purposes," "[a]n independent educational evaluation at public expense, to include a Functional Behavior Assessment," "[d]evelopment of an IEP for [B.B.] comporting with the findings of the Independent Educational Evaluation and Functional Behavior Assessment," and the provision of "copies of all education records requested by [B.B.] or [B.B.'s] legal counsel directly to [B.B.'s] legal counsel[.]"

> **(n)  Subsequent Events**

187. Despite the findings and relief ordered by the DDOE Special Education Due Process Hearing Panel in March 2023, B.B. continued to be denied FAPE.  APER has not complied with the Hearing Panel decision.  As a direct result of APER's actions, B.B. continued to suffer

---

[6] As discussed in paragraphs 83-84 above, the "instruction" provided in each of these settings was essentially self-study with minimal guidance.

irreparable harm, including lost educational opportunities and the denial of FAPE, until he aged out of IDEA eligibility on August 31, 2023.

188.     Between December 2023 and January 2024, B.B. submitted another request for accommodations to the CEA3 requirements.  In March 2024, his request was approved, and he was able to resubmit his paper for grading.  His paper was returned to him in April 2024 for some edits and was resubmitted again later that month.

189. APER appealed to this Court.  CLASI filed a counterclaim to APER's complaint, raising claims for violations of the Rehabilitation Act and the ADA and appealing discrete portions of the hearing panel's decision.  Those civil rights claims under the Rehabilitation Act and the ADA could not be raised before the Due Process Hearing Panel.  That case is pending in this Court under civil action number 23-391.

### 3.  C.C.

#### (a)  Background

190. C.C. was born in 2000.  He has been diagnosed with ADHD, anxiety, and depression. He has been receiving some form of educational support since approximately fourth grade, when he was found eligible for a 504 Plan.

191. C.C.'s mother has been involved in his special education from the time he was in elementary school.  Addressing C.C.'s early years during the Due Process Hearing described below, C.C's mother explained:

> Dealing with [C.C.] and ADHD, early on when he was in 1st grade and he told me he couldn't sit on the mat and I said, why can't you sit on the mat like the other kids?  And he said, I just can't sit that long.  He said I can't, it's just so hard.

She explained that "he's all over the place" and requires "redirection, redirection, redirection."

192. C.C. was originally found eligible for special education and related services and received an IEP in June 2014.  Prior to his incarceration, C.C. attended Wallace Wallin School,

which is an Intensive Learning Center for students who have not been successful in their home schools due to a history of behavior problems.  He enjoyed learning new things, and, prior to incarceration, liked going to school.

### (b)  APER Failed to Take Timely Action to Provide C.C. with Needed Education and Services

193. C.C. entered Young on January 4, 2019, and he was released from DDOC custody in March 2023.  He was housed at Young for his entire incarceration, except for two weeks at Vaughn.  APER initially contacted him regarding the potential to receive special education and related services in February or March 2019 and then administered the TABE on March 21 and 22, 2019.  No other assessments were completed at that time or at any point prior to April 29, 2022 (the report associated with that assessment was not completed until December 1, 2022).

194. For roughly a year, C.C. worked toward completing his GED.  He was provided with some special education, but it is unclear what he received because there is no IEP or related documentation.  Then, on February 19, 2020, C.C. decided to pause his work towards the GED. Shortly after C.C. signed out of education, APER changed its policy and would no longer provide a student with special education while pursuing a GED.  On information and belief, this action was taken in retaliation against students who sought legal assistance from CLASI and filed complaints. As a result, C.C.'s only option for receiving special education was to pursue his high school diploma.

### (c)  APER Did Not Design C.C.'s April 30, 2021 IEP to Address His Needs

195. On March 1, 2021, as COVID-19 restrictions were reduced, C.C. expressed his interest in restarting his education.  On April 27, 2021, APER held an IEP Team meeting to determine his continued eligibility for special education and his capacity to provide informed consent.

196. C.C. had previously indicated his interest in having his mother attend his IEP Team meetings.  However, his mother was not notified or invited to the April 27, 2021 meeting.  Moreover, APER did not send C.C. an invitation prior to that meeting, seek any input from C.C. prior to that meeting, or ask C.C. whether he wanted to invite someone to it or explain to him that he had the right to do so.  C.C. was summoned to the IEP Team meeting and told what it was when he arrived.  At the meeting, without explanation of what he was signing, C.C. was asked to waive his right to prior notice of the meeting.

197. The IEP Team meeting took 11 minutes to determine that C.C. had the capacity to make his own educational decisions (8 minutes) and that he continued to qualify for special education (3 minutes).  The speed with which the meeting was completed demonstrates its inadequacy.  Typically, IEP meetings, especially those where the IEP Team is determining a student's eligibility, take far more time than 11 minutes to complete.

198. The IEP Team met again three days later.  Again, APER did not contact C.C. or his mother prior to the meeting, and, again, C.C. was notified of the meeting at the meeting.  The IEP Team reviewed the records it received from Wallace Wallin School and C.C.'s TABE results.  Ms. Myers did not believe that this information was sufficient for APER to sufficiently identify C.C.'s needs.

199. APER identified and developed three goals for C.C.'s April 30, 2021 IEP—one related to math, one related to reading, and one related to the CEA3.  As with the other examples described herein, the IEP was not written based on C.C.'s needs, but rather based on APER's resources, or lack thereof.  C.C.'s education was limited to 45 minutes per type of instruction per week because APER did not have the resources to support anything more.  Ms. Myers testified that APER "banked on students saying that they didn't want education so that we could . . . provide education

64

to everybody who wanted it in the course of a day." She also testified that "IEPs weren't written [by APER] to meet students' needs, they were written . . . so that students could have access to education given the amount of resources that we had." Ms. Devonshire stated that "it wasn't really possible for it [the IEP] to [meet C.C.'s needs] . . . because there was only so much that we were, like, physically realistically able to provide each week based on staffing."

200. **Math Needs.** The 2021 IEP stated that C.C. is "able to solve 50% of word problems per a recent standardized test." To address that need, the IEP Team included individual instruction for fifteen minutes, three times per week, for a total of 45 minutes per week. The IEP stated that C.C. would need "[r]epetition of instruction, checks for understanding, teacher modeling, use of calculator to check answers, use of security-approved manipulatives, [and] breaks in instruction[.]" Except when C.C. was on Q Pod, these potential three 15-minute sessions were the only math instruction he was offered. In reality, it was all self-study with minimal assistance.

201. This had predictable results. In 2017, C.C. had been administered the Wide Range Achievement Test – Revision 4. At that point, he was 16 years old, but his math computation skills were at the fourth-grade level, placing him in the 2nd percentile (with 98 percent of students outperforming him). When APER administered the same test to C.C. five years later in April 2022, he was still in the 2nd percentile.

202. **Reading Needs.** The 2021 IEP stated that, "[o]n a standardized assessment, [C.C.] was able to read at a 6th grade reading level, scoring a 46 percent in the area of making inferences and drawing conclusions." To address this need, the IEP Team included individual instruction for thirty minutes, two times per week, for a total of one hour per week. It stated that C.C. would need "[g]raphic [o]rganizers, checks for understanding, use of dictionary when needed, breaks in instruction, read-alouds when necessary, use of notes, [and] use of highlighter[.]" Except for when

C.C. was on Q Pod, these potential two half-hour sessions were the only reading instruction he was offered.  In reality, it was all self-study with minimal assistance.  Furthermore, both Ms. Devonshire and Ms. Myers testified that APER does not have any intensive, evidence-based reading programs for students with significant reading needs, like C.C.  As with math, this failure to provide reading instruction had the predictable result.  In 2017, C.C.'s ability to recognize words in isolation was at the seventh-grade level, in the 32nd percentile, and his sentence comprehension was at the fourth-grade level, in the 5th percentile.  When APER reevaluated C.C. in April of 2022, his ability to recognize words in isolation fell to the 18th percentile and his sentence comprehension rose some but was still substantially below average at the 10th percentile.

203. **CEA3.**  C.C.'s 2021 IEP states:

> [C.C.] is able to compose a multi-page text with mostly correct punctuation and capitalization, but without formatting for paragraphs.  He demonstrates the ability to use transitions between ideas in some of the text.  He demonstrates the ability to introduce the subject, but needs a conclusion, and also does not stay primarily on topic.  Evidence is given, but does not directly support the thesis, and does not give directional flow toward a conclusion.

204. To address this, C.C. would need "[g]raphic organizers, checks for understanding, use of a dictionary when needed, use of writing frames, modified assignment requirements (including but not limited to length), use of computer or word processor, teacher assistance planning and editing, teacher assistance with grammar, [and] modeling use of transitions."  This description of "instruction" (which are mostly accommodations) was to be provided at most for 30 minutes, three times per week, totaling 1.5 hours a week.  Again, this frequency was not based on C.C.'s need but APER's resources.  Ms. Myers testified that C.C. would "[o]bviously [] need more than three times at 30 minutes."

205. The "instruction" set forth in C.C.'s IEP related to the CEA3 consisted almost exclusively of accommodations, contained no research-based instructional methods, and was

neither intensive enough to appropriately address C.C.'s disability-related needs nor was it based on his demonstrated needs.

206. C.C. worked on his CEA3 research paper for approximately eight months, finishing it in early December 2021. However, APER did not grade the paper or provide C.C. with credit for its completion. Neither Ms. Myers nor Ms. Devonshire submitted C.C.'s paper for the same reasons described above (paras. 132, 168) for A.A. and B.B.

207. **Behavioral Needs.** C.C.'s IEP immediately prior to entering Young included supports related to his myriad behavioral needs. For example, that IEP included the following accommodations, modifications, and supports: "scaffold instruction/directions, preferential seating," "consistent check-ins, and extra time," "redirection to task, repetition, directions reread, verbal prompts," "checks for understanding of directions, assignments, and assessments," "[p]rovide instruction in a small group setting; increased adult support; extra time to complete assignments/assessments; preferred seating; chunking of assignments/assessments; refocusing of attention," "positive reinforcement; regular feedback; teacher check-ins," "clear and concise classroom procedures/expectations," "testing in a quiet environment," "[c]ontinuous parent contact when [C.C.] is absent," "conferences with student in regards to make up work," "form relationships with student to facilitate attendance," "increased adult support," "modifying assignments in length and/or complexity, as needed," and "[d]irect instruction modeling, and feedback in persevering through non-preferred tasks."

208. That IEP was still current when C.C. entered Young in 2019. However, APER's practice was to not implement or adopt an IEP developed in the community. Rather, when APER developed C.C.'s April 2021 IEP, it stripped away any behavioral supports, leaving just those limited items described above (paras. 200-205) with regard to math, reading, and CEA3.

209. APER staff who worked with or saw C.C. during this time were aware that he struggled with focusing for long periods of time and worked better in short durations.   He continued to experience these behavioral issues during his education at Young.

210. APER was also on notice that C.C. had experienced attendance issues throughout his education.  C.C. continued to experience these issues at Young, yet APER did not put any supports in place to help him.

211. Ms. Devonshire and Ms. Myers, who were members of C.C.'s IEP Team, believed that the education included in C.C.'s IEP was not sufficient to meet C.C.'s needs.  Moreover, Ms. Myers stated that C.C. was not going to receive "any real supports for any . . . struggles he may have with [ADHD]" because APER did not provide behavioral interventions or behavior support plans and did not conduct manifestation determination reviews.

212. On this topic, the DDOE Special Education Due Process Hearing Panel decision issued in March 2023 found the following:

> It does not appear to the Hearing Panel that [C.C.'s] IEP was designed to provide [C.C.] with a FAPE, as it was not drafted to address [C.C.'s] needs as identified in [C.C.'s] evaluation in order to enable [C.C.] to make progress.  Further [C.C.'s] goals were not created with an eye toward meaningful improvement relating to [C.C.'s] potential.  More concerning is that they do not appear to have been measured at all.

> Creating an IEP based on "available resources" is not the standard.  The Hearing Panel is concerned that APER needs to improve overall delivery of service for all students receiving special education including, but not limited to: evaluations, goal writing, progress monitoring, and student feedback regarding process.  Testimony by APER employees openly admitting that IEPs "weren't written to meet students' needs" and further admitting that IEPs were drafted based on what APER could provide as opposed to what a student specifically required/needed is problematic. There was no identifiable system internally to self-audit special education files and ensure that IEPs are timely and appropriately developed, implemented, and meaningfully utilized.  Therefore, the Hearing Panel finds that APER denied [C.C.] a FAPE when it failed to provide an IEP that considered existing evaluations or that was reasonably calculated to enable [C.C.] to make meaningful progress.

**(d)   APER Did Not Provide C.C. with Education in the Least Restrictive Environment**

213. C.C.'s least restrictive environment was never addressed at any of his IEP Team meetings.  For over 500 days, the education that C.C. received was provided to him on his own with limited individual instruction.  On this topic, the DDOE Special Education Due Process Hearing Panel found:

> This restrictive educational environment was provided not as a result of review of prior placements, evaluations, or any determination that this was an appropriate environment for [C.C.], but rather by default.  The IEP Team never discussed what an appropriate learning environment for [C.C.] would be. . . . [C.C.] would have benefitted from a less restrictive environment.  Therefore, the Hearing Panel finds that APER deprived [C.C.] of a FAPE when APER provided [C.C.] education in a more restrictive environment than was appropriate for [C.C.] academically or necessary for State security reasons.

**(e)   APER Failed to Provide C.C. with Any Meaningful Education on the West Side of Young or at Vaughn**

214. While on the West Side at Young, either as a pre-trial detainee or when he was sentenced and transferred to the restrictive housing unit, C.C. was educated without any peers. As with the students described above, he was educated in a small room, without a table, through a plexiglass window.  C.C. never knew when Ms. Devonshire was coming for instruction.

215. Ms. Devonshire planned to see C.C. three days per week but did not do so regularly until March or April of 2022.  Each session would typically last between 30 and 45 minutes because the room was uncomfortable.  Ms. Myers explained, "[y]ou're sitting in a room with a stool and no table . . . I didn't want to do it [and t]hey didn't want to do it either . . . we [could offer] them an hour and a half, but obviously knew that there was very little chance of them having the stamina to be in that context for an hour and a half."

216. C.C. was transferred to Vaughn for two weeks in June 2021. Before the transfer to Vaughn and the transfer back to Young, he received no notice as to the impact on his education. While at Vaughn, he received no education.

**(f)     With Limited Exception, APER Failed to Provide C.C. with Any Meaningful Education on the East Side of Young**

217. When C.C. transferred to the East Side of Young, he was first on V Pod. He did not receive any education there. He was then on R Pod, where he went to the education wing for individual education sessions and some small group instruction three to four times per week. APER did not hold any IEP meetings prior to these changes or prior to any of C.C.'s placement changes.

218. In January 2022, C.C. transferred to Q Pod. Although that came with more opportunity for education, the learning environment was noisy and distracting, as described above (para. 177). Ms. Devonshire described working on Q Pod as "trying to learn in, like, the gym at a YMCA." She needed to verbally redirect C.C. at least every five to ten minutes during the limited periods in which she was there.

219. Between June and September 2022, Ms. Devonshire provided instruction to a small group of students, including C.C., for one hour and 15 minutes almost every morning. The small group was helpful to C.C. because the students worked well together and were able to focus on their work and complete their courses.

220. In September 2022, APER abruptly ended C.C.'s small group sessions without notice or an IEP Team meeting. These are the same small group sessions that were abruptly ended for B.B. and everyone else in the small group, including C.C., immediately following a pre-hearing conference in B.B.'s case before the DDOE Special Education Due Process Hearing Panel. *See*

paras. 178, 183 above.  The removal of the small group sessions caused him to struggle and slowed his progress toward graduation.

221. In December 2022, C.C.'s programming changed again when Ms. Devonshire was suspended and ceased providing instruction at Young.  As a result, APER stopped providing C.C. with anything even remotely resembling specialized instruction, although he was still able to attend the education sessions on Q Pod.

222. APER never considered C.C.'s need for physical education, nor did it ever provide C.C. with physical education.

> **(g)  APER's Failures Contributed to C.C.'s Behavioral Issues and APER Never Made a Manifestation Determination, Conducted a Functional Behavior Assessment, or Developed a Behavior Support Plan**

223. C.C. was placed on the restrictive housing unit at least three times.  Had APER provided C.C. with the services and supports that he needed for behavioral issues, there is a strong probability that those incidents would not have occurred or, at a minimum, that C.C. would have been equipped to handle them better.  APER never made any manifestation determinations, conducted a functional behavioral assessment, or developed a behavior support plan.

> **(h)  APER Refused to Provide C.C.'s Education Records to His Counsel**

224. As with the students described above, APER refused to provide copies of C.C.'s education records to CLASI.  It also did not disclose all of C.C.'s requested records to him directly. Like the DDOE Special Education Due Process Hearing Panel with regard to A.A., the DDOE Special Education Due Process Hearing Panel found this "unconscionable" and a "deprivation of FAPE."

### (i)   APER Did Not Timely Renew C.C.'s IEP in 2022 or 2023 to Address His Needs

225. Ms. Myers resigned from APER in March 2022.  At that time, APER split up the Young special education caseload among the educational diagnosticians at the other DDOC facilities.

226. C.C.'s IEP expired on April 29, 2022, but there was no new IEP or agreement to extend it.  APER continued to use C.C.'s outdated IEP until January 2023.

227. On July 29, 2022, APER invited C.C., who was by then represented by CLASI, to an August 12, 2022, meeting to conduct a redetermination of eligibility and to revise his IEP.  That meeting did not take place.  It was rescheduled for September 30, 2022, and then for December 2, 2022.  APER invited C.C.'s mother to attend the meetings, but she initially could not make the December 2 date.  However, the morning of that meeting, she became available and tried to join virtually, but when she attempted to participate, the entire meeting was shut down on the basis that C.C.'s mother had not received the required clearances.  That was the first time that C.C.'s mother had heard of any required clearances.  The meeting was then rescheduled to January 19, 2023.  Although C.C.'s mother was present via videoconference for that meeting, she had difficulty hearing the participants well.  While CLASI has an unsigned draft version of the January 19, 2023 IEP developed at that meeting, neither C.C. nor CLASI have ever received the final version.  However, based on the unsigned version, the IEP appears to suffer from the same substantive flaws as C.C.'s earlier APER IEPs.

### (j)   Numerous Other Procedural Violations Deprived C.C. of FAPE

228. The DDOE Special Education Due Process Hearing Panel found that "APER's failures related to evaluations of [C.C.] deprived [C.C.] of a FAPE"; that "same day notice is not 'notice,'" and that "this procedural violation rises to the level of a deprivation of FAPE as [C.C.] (and

[C.C.'s] mother) was not able to prepare for, and therefore fully participate in, the meeting that would develop an IEP for [C.C.]"; that C.C. "was denied a FAPE as a result of the failure of APER's to adopt, develop, implement, and review [C.C.'s] IEP on the schedule and with the frequency as required by the IDEA"; that "despite acknowledging and testifying that [C.C.'s] educational programming would change, APER did not hold an IEP Team meeting nor provide prior written notice upon [C.C.'s] transfers"; and that "APER's failure related to holding IEP meetings denied [C.C.] a FAPE."

229. Although APER completed an Evaluation Summary Report on April 27, 2021, it failed to conduct a triennial evaluation at that time as required.  Without current data, APER could not have appropriately identified C.C.'s needs and developed an IEP designed to provide him with FAPE.

230. APER also never considered C.C.'s need for extended school year services.  At the due process hearing, Ms. Forde-Whelan offered conflicting testimony as to when APER may include extended school year services in an IEP.

> **(k)    Altogether, the DDOE Special Education Due Process Hearing Panel Found Numerous Substantial Violations of the IDEA**

231. C.C. filed a Due Process Complaint on October 24, 2022.  After the hearing, the DDOE Special Education Due Process Hearing Panel found that APER deprived C.C. of FAPE in a multitude of ways.  The Hearing Panel awarded C.C. $232,000 in compensatory education for 3,096 hours of missed education based on APER's failure to provide FAPE going back to 2019 (excluding the approximately one year when C.C. signed out of education), finding that APER knew of its deficiencies at least as of 2017 and failed to remediate them.

**(l)   Subsequent Events**

232. C.C. was released to the community in March 2023 and officially graduated with his high school diploma shortly thereafter.  He re-entered Young on November 20, 2023.

233. APER appealed from the DDOE Special Education Due Process Hearing Panel's order to this Court.  CLASI filed a counterclaim to APER's complaint, raising claims for violations of the Rehabilitation Act and the ADA against both APER and DDOE.  Those civil rights claims could not be raised before the Hearing Panel.  That case is pending in this Court under civil action number 23- 468.

**4.   Students Who Have Been Waitlisted for Education at Young**

234. On information and belief, there is currently a waitlist for eligible students to receive any secondary general or special education at Young, and the wait time can be months.

**E.   AN APER POLICY DOCUMENT UNDERSCORES MANY OF THE PROBLEMS DESCRIBED HEREIN**

235. A document, which, on information and belief dates from around 2013, sets forth certain APER policies.  While parts of it describe good policies that APER is required to follow, but is not following, other parts of the policy are flawed and underscore many of the problems identified by the DDOE Special Education Due Process Hearing Panels addressed above.  Below are some examples.

(a)   The policy caps the amount of specialized instruction that APER students can receive.  The caps correlate with the amounts in the IEPs described above:

> Pre-trial special education students receive education two hours a week if they are housed on the West Side.  Disciplinary pod receives one-half hours weekly or at the discretion of [DDOC].

The IDEA requires that IEP Teams have the discretion to determine the appropriate amount of specialized instruction that the student needs.

(b)     By imposing a 60-day waiting period for students entering Young and Vaughn, the policy conflicts with the requirement of IDEA to provide FAPE, including services comparable to those under an existing IEP, upon arrival:

> As of 10-18-2011 only a goal for written expression is needed.  You may continue to write a Temporary IEP based on reading or math levels.  After the 60 day waiting period, if the detainee agrees to participate in a special education program then follow procedures to develop a temporary or revise an annual IEP sent from a district or detention center.

(c)     Timeframes in the policy do not align with the IDEA and likely explain some of the delays described above.  The table copied below shows how a student who is detained that is first identified as potentially needing special education on March 30 would not be receiving all components of that education until October.

| 1st Time ED sees detainee's name on Pre-Trial List. ED places name on "Potential Special Education Pre-Trial Detainee" listing | 30 days later the name appears again on a Pre-Trial Detainee listing, the ED checks DELSIS to determine if the detainee was eligible for Special Education Services. If yes, the ED contacts the detainee within 7 days to (on 61st day 12-16-13) determine if he/she wants to participate in the program | If the detainee chooses to participate in the program, within the next 30 days the program conducts a Temporary IEP meeting to develop an IEP. | Instructions begins no later than 30 working days after the detainee has been contacted and consented to participate in the educational program. The gathering of records from previous educational providers continue. | If the detainee is still in Pre-Trial six months after his/her name appeared on the Pre-Trial Listing for the second time, any missing information in the IEP process must be obtained by the local prison program. |
|---|---|---|---|---|
| March 30 | April 30 to end of first week of May | Second week of May to the second week of June | Instruction begins no later than the third week of June. | In October, any necessary components still missing should be scheduled be the ED. |

The policy for pre-trial detainees further states:

> No later than 37 days after the detainee's name has appeared for a second time on a "List of Offenders Under 21", tutorial instruction will be provided by a Prison Ed teacher in accordance with the benchmarks and goals/objectives outlined on the detainee's Temporary IEP or IEP from a district . . . . Students are to be contacted on the 61st day. . . . If the detainee remains in the Pre-Trial population for six months, any missing information such as the Special Education Portfolio must be acquired, e.g. if a psychological evaluation is needed to complete the portfolio, then the Educational Diagnostician will contact the contracted psychologist for the needed assessments.

This portion of the policy was changed in 2020 as a result of two state complaints, but, on information and belief, APER has reverted to the policy described above. Under the IDEA, an LEA is not permitted to build in such delay periods before starting education.

76

(d)     The policy states that "related services are not offered at PAEP [Prison Adult Education Program]" and "Related Services: are not offered at PAEP.  [DDOC] provides for medication for behavior and counseling, and out of institution psychiatric care."  Related services are a central part of the IDEA and must be provided if the IEP Team determines that a student needs them.

(e)     The policy requires "A copy of the *Procedural Safeguards Notice* . . . to be given to the student and sent to parent."  That is generally not being done.

(f)     The policy states that "An I.E.P. shall be implemented the same day of the meeting in PAEP."  This removes the right of a student or parent to challenge decisions of the IEP Team or otherwise invoke their right to "stay put."  If the IEP calls for a change in placement, 14 Del. Admin. C. § 926.3.1 would call for 10-day prior written notice.

(g)     The policy manual requires APER to make pre-determinations for decisions which should be left to the IEP Team, including with regard to Discipline ("Complete section as follows: student is incarcerated by the court system.  Her or his program may be affected by security concerns with the prison environment (attendance)."), extended school year services ("Place in the blank area that PAEP provides a 12-month program.  Rationale for Decision: In this section please write: FAPE is delivered through the educational program in a **separate setting**[.]"), and least restrictive environment ("Students convicted as an adult do not meet [least restrictive environment] . . . Options for statements in [least restrictive environment] section depends upon housing placement by DOC.  Placement is court mandated.").

(h)     The policy states: "In selecting the LRE [least restrictive environment], consideration is given to any potential harmful effect on the [student] or on the quality of services he or she needs.  A student with a disability is not removed from education in age-appropriate

regular classrooms solely because of needed modifications in the general curriculum."  This

comports with the law.  However, the next sentence rejects what would be an appropriate policy.

It states: "Segregation overrides this section."  As the DDOE Special Education Due Process

Hearing Panels for A.A., B.B., and C.C. explained, APER is mistaken and is conflating living

arrangements with education.  *See also* para. 43 above.

> (i)       The policy states:

> Behavior: Positive intervention strategies and supports to address the behavior
> through behavioral interventions and strategies may be needed to address behavior
> that impedes the inmates learning or that of others. . . . Therefore, behavioral goals
> and objectives may be developed as part of the IEP process.  In some cases,
> classroom and institution rules might be enough to address behavior that interferes
> with learning.  <u>They are not required because of the very restrictive environment
> that they are enrolled.</u>

(Emphasis added).  As described above, APER is generally failing to provide critically needed

behavioral services.  Policy statements like this may explain why this is occurring.

> (j)       The policy further states:

> Behavioral Intervention Plans (BIPS) are actually only required in the disciplinary
> context, <u>by K-12 schools</u>, after a manifestation determination (see regulations
> Subpart E, section 30.0).  **BIPs are <u>not</u> required for students in separate settings,**
> since response to major misconduct will actually much more likely be driven by
> the institution's security and penological interests that "can not otherwise be
> accommodated."

As described above, the required manifestation determinations are not being completed.

Moreover, the IDEA requires interventions to address special education needs.  This passage

instead states that behavioral intervention plans do not need to be provided to students in

correctional facilities, which directly contravenes federal and Delaware law and federal guidance.

> (k)       The policy states: "There should be a direct line from the PLEP [Present

Levels of Educational Performance] and statement of special education service towards the

measure [sic] annual goal with benchmarks."  Later, it states that the IEP shall have "measurable

annual goals." As described above, the IEPs for A.A., B.B., and C.C. did not have measurable goals.

(l)     The policy states, "Special Education Services may be delivered by general education teachers." This policy does not comport with the IDEA, which sets forth the required qualifications for special education teachers to ensure that they are "appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities." 20 U.S.C. § 1412(a)(14)(A), (C). The policy also does not comport with the Delaware law setting forth the requirements for a Special Education Teacher of Children with Disabilities. *See* 14 Del. Admin. C. § 1571.

(m)     Finally, the policy states:

> The teacher/supervisor must provide a copy of a student's educational record to the parents or eligible student, upon request. Failure to provide the copy would effectively prevent the parent or eligible student from exercising the right to inspect and the review the records at the PAEP [Prison Adult Education Program] site. A written request must be supplied and reviewed by the T/S [teacher/supervisor].

As described above, APER refused to provide educational records to A.A.'s mother and to the counsel of the three students described herein.

236. Consistent with these flaws, the Student Handbook for the Groves program at Young states that "Adult students are required to demonstrate a ninth grade achievement level in the areas of reading and math on the Test of Adult Basic Education (TABE) D level prior to enrolling in Groves courses." Although Plaintiff is not aware of this restriction being enforced, the plain terms of this policy discriminate against any student who has not met the requirement due to a disability.

## F.     DDOE'S FAILURE TO MONITOR AND ENSURE COMPLIANCE WITH FEDERAL AND DELAWARE LAW

237. DDOE has failed to monitor APER effectively in order to ensure that it complies with the IDEA. Although DDOE has performed some monitoring associated with the state complaint

decisions described above, that monitoring has been grossly deficient, which has contributed to the serious ongoing violations described herein.  DDOE has never issued an annual performance report related to APER's performance.  DDOE's lack of effective oversight of APER and its failure to enforce compliance against APER has allowed these systemic violations to continue.

## G.   IRREPARABLE HARM DUE TO THE FAILURES DESCRIBED HEREIN

238. The failures described herein irreparably harm the students with disabilities who are subject to these deficiencies and violations.  These irreparable harms include, inter alia, the denial of the students' ability to complete their work, make academic progress, and earn a high school diploma.

239.   Students with disabilities are eligible for special education and related services only until the end of the school year (August 31) in which they reach age 22.  Yet they wait many weeks and months either without any education or are being provided only minimal education that does not address their needs or allow them to make academic progress, while the time period to receive their special education and related services continues to run and eventually lapses.

240. Moreover, a common response to such failures is that students disengage, experience academic failure, and exhibit problem behavior.  The potential for these outcomes is magnified for this population (there is a high prevalence of mental health issues among incarcerated students), especially since the students are routinely denied related services such as counseling and psychological supports.  The lack of behavioral services within the education program at Young and Vaughn has undoubtedly contributed to students' behavior problems and resulted in their isolation as punishment in the facilities, which results in further harm.

241.   Without access to FAPE, students with disabilities may be forced, in the long term, to pursue a GED.  Having a GED instead of a high school diploma puts young people in jeopardy

for their adult life, as employers typically look to hire those with a GED for lower paying unskilled labor positions.  A GED does little for generating economic opportunity in the long term.

242.   Many incarcerated students with disabilities have already experienced years of academic failure.  Their current frustrations with inconsistent and inadequate general education and special education (and little to no related services) while incarcerated at Young and Vaughn likely lead them to feel disconnected from the school environment.  They may abandon any hopes for earning a high school diploma.

243.   In the long term, failure to obtain a high school diploma is associated with an increased likelihood that the student will experience unemployment, poverty, mental health issues, physical health problems (e.g., diabetes, heart disease), drug abuse, and criminal behavior, which can also lead to a higher risk of reincarceration.  Students without a high school diploma have an unemployment rate of almost double those with a diploma and, when employed, earn substantially less than those with a diploma.

## H.   THE DELAWARE AGENCIES DID NOT BEGIN TO COMPLY WITH THE LAW AFTER CLASI INFORMED THEM OF THE WIDESPREAD AND ONGOING DEFICIENCIES IN PROVIDING EDUCATION TO STUDENTS WITH DISABILITIES AT YOUNG AND VAUGHN

244. In a series of communications beginning in 2022, CLASI attempted to address the problems described in this Complaint with DDOC.  CLASI and DDOC met on May 1, 2023.  On information and belief, DDOC took no action thereafter to attempt to rectify these problems.

245. On April 26, 2023, CLASI wrote to DDOE to request that it address the widespread and ongoing deficiencies related to the provision of education to students with disabilities described in this Complaint.  CLASI and DDOE met on May 25, 2023.  No meaningful communication about resolving the deficiencies occurred thereafter.  On information and belief, DDOE took no action thereafter to attempt to rectify these problems.

# VI

## COUNTS

## COUNTS 1A THROUGH 1H: VIOLATION OF THE IDEA AND DELAWARE LAW
### (AGAINST DEFENDANTS APER AND MS. FORDE-WHELAN)

246. Plaintiffs incorporate by reference all of the allegations above as if specifically set forth herein.

### Count 1A
### Deprivation of FAPE by Failing to Provide Education and Services and Develop IEPs Upon School Transfers

247. As described above (including in paras. 22-32, 47, 77, 108, 151-152, 185, 193-194, 235(b), (c)), upon school transfers, including those resulting from a student's entry into a Delaware correctional facility, APER fails to provide FAPE, including services comparable to those described in previous IEPs and fails to develop, adopt, and implement IEPs. APER's failures are numerous and systemic. APER and Ms. Forde-Whelan have violated and continue to violate numerous provisions of the IDEA including 20 U.S.C. §§ 1401(9) (FAPE defined), 1401(9)(B) (the agency must "meet the standards of the State education agency" to provide FAPE), 1412(a)(1)(A) (obligation to provide FAPE), 1413(a)(1) (LEAs must have "in effect policies, procedures, and programs that are consistent with the State policies and procedures"), 1414(d)(2)(A) (IEP must be in effect at the beginning of each school year), 1414(d)(2)(C)(i) (regarding obligations as to transfer students), 1415(a) (requiring state to set procedures to comply with the IDEA); related federal regulations including 34 C.F.R. §§ 300.101 (FAPE), 300.201 (LEAs must have "in effect policies, procedures, and programs that are consistent with State policies and procedures"), 300.323(a) (IEP must be in effect at the beginning of each school year), and 300.323(e) (regarding obligations as to within-state transfers); and Delaware law, including 14 *Del.C.* §§ 3101(5) (FAPE), 3120 (right to receive public education), and 14 Del. Admin. C. §§

922.1.0 (purposes of Children with Disabilities provisions), 924.1.2 (consistency with state policies), and 925.10.0 (when IEPs shall be in effect).

### Count 1B
### Deprivation of FAPE by Failing to Timely and Adequately Evaluate Students with Disabilities Based on their Individual Needs

248. As described above (including in paras. 22-32, 34, 78, 109, 152, 166, 193, 235(b), (c)), APER fails to timely and adequately evaluate students with disabilities based on their individual needs. APER's failures are numerous and systemic and deprive students of FAPE. APER and Ms. Forde-Whelan have violated and continue to violate numerous provisions of the IDEA and related regulations, including those regarding timely, adequate, and individualized evaluations (20 U.S.C. §§ 1412(a)(7), 1414(a)-(c) and 34 C.F.R. §§ 300.301, 300.304, and 300.305), the provisions addressed in paragraph 247 above regarding FAPE and adequate policies, procedures, and programs (20 U.S.C. §§ 1401(9), 1412(a)(1)(A), 1413(a)(1), and 34 C.F.R. §§ 300.101, 300.201), and the provisions addressed in paragraph 247 above that integrate Delaware law into the IDEA (*see* 20 U.S.C. §§ 1401(9)(B), 1413(a)(1), 1415(a); 34 C.F.R. § 300.201), as well as Delaware law, including 14 *Del.C.* §§ 3101(5) (FAPE), 3120 (right to receive public education), 14 Del. Admin. C. §§ 922.1.0 (purposes of Children with Disabilities provisions), 923.22.0 (evaluations), 924.1.2 (consistency with state policies), 925.2.0 (initial evaluations), 925.4.0 (evaluation procedures), and 925.5.0 (additional requirements for evaluations and reevaluations), 925.10.0 (when IEPs shall be in effect).

### Count 1C
### Deprivation of FAPE by Failing to Timely Develop Appropriate IEPs for Students with Disabilities Based on their Individual Needs

249. As described above (including in paras. 22-32, 35-43, 66-75, 79-82, 94-95, 109-127, 142-143, 153-167, 170-172, 186, 195-213, 231, 235(a)-(d), (g)-(j)), APER fails to timely develop appropriate IEPs for students with disabilities based on their individual needs. APER's failures

are numerous and systemic and deprive students of FAPE. These include the failure to ensure that IEPs have sufficient specialized instruction, related services (including behavioral services), supplementary aids and services, and extended school year services, to be provided in the least restrictive environment, as well as general education necessary to be involved in and make progress in the general education curriculum. APER and Ms. Forde-Whelan have violated and continue to violate numerous provisions of the IDEA and related regulations including 20 U.S.C. §§ 1412(a)(5) (least restrictive environment), 1414(d) (IEPs) (including 1414(d)(3)(B)(i) (behavioral interventions)), and 34 C.F.R. §§ 300.106 (extended school year services), 300.114-300.316 (least restrictive environment and placements), 300.320 (IEPs), 300.324 (development, review, and revision of IEPs), the provisions addressed in paragraph 247 above regarding FAPE and adequate policies, procedures, and programs (20 U.S.C. §§ 1401(9), 1412(a)(1)(A), 1413(a)(1), and 34 C.F.R. §§ 300.101, 300.201), and the provisions addressed in paragraph 247 above that integrate Delaware law into the IDEA (*see* 20 U.S.C. §§ 1401(9)(B), 1413(a)(1), 1415(a); 34 C.F.R. § 300.201), as well as Delaware law, including 14 *Del.C.* §§ 3101(5) (FAPE), 3120 (right to receive public education), 14 Del. Admin. C. §§ 922.1.0 (purposes of Children with Disabilities provisions), 923.6.0 (extended school year services), 923.12.0 (IEPs), 923.14.0 (least restrictive environment), 923.15.0 (continuum of alternative placements), 923.16.0 (placements), 924.1.2 (consistency with state policies), 925.7.0 (definition of IEP), 925.10.0 (when IEPs shall be in effect), 925.11.0 (development, review, and revision of IEPs), and 925.13.0 (least restrictive environment).

**Count 1D**
**Deprivation of FAPE by Failing to Implement IEPs as Required**
**and Provide Needed Education and Services**

250. As described above (including in paras. 22-32, 35-43, 66-75, 83-95, 123-131, 134-137, 142-143, 170-180, 185-186, 213-222, 230-231, 235(a)-(d), (g), (h)-(j), (l)), APER fails to

implement IEPs as required and as needed to provide FAPE.  This includes the failure to provide anything approaching an appropriate secondary school education, the failure to provide the number of hours of specialized instruction required by the students' IEPs and as are necessary to make progress in the general education curriculum, the failure to provide instruction in an environment and in a manner conducive to education, the failure to provide related services (including behavioral services), the failure to provide sufficient supplementary aids and services, the failure to provide any extended school year services, and the failure to provide education in the least restrictive environment.  APER's failures are numerous and systemic and deprive students of FAPE.  APER and Ms. Forde-Whelan have violated and continue to violate numerous provisions of law, including those referenced and cross-referenced in paragraph 249 above, as well as 20 U.S.C. § 1412(a)(14)(C) (state certification required for special education teachers), 14 *Del.C.* § 2402 (qualifications of employees for the Prison Education Program are the same as qualifications for employees in public high school), 14 *Del.C.* § 3121 (special classes and facilities), and 14 Del. Admin. C. § 1571 (Delaware requirements for Special Education Teachers of Students with Disabilities).

### Count 1E
### Deprivation of FAPE by Failing to Make Manifestation Determinations
### and Then Take Required Follow-Up Action

251. As described above (including in paras. 22-32, 44-45, 96-97, 138, 142-143, 181, 186, 223, 231, 235(d), (h)-(i)), where a student is facing a disciplinary change of placement, APER fails to make manifestation determinations and then take required follow-up action such as to conduct a functional behavior assessment and develop a behavior support plan, and also has the secondary effect of depriving students of special education as punishment.  APER's failures are numerous and systemic and deprive students of FAPE.  APER and Ms. Forde-Whelan have violated and continue to violate numerous provisions of the IDEA including 20 U.S.C. §§ 1415(k)(1)(E)-(F)

(manifestation determinations) and related federal regulations including 34 C.F.R. § 300.530(e) (manifestation determinations), the provisions addressed in paragraph 247 above regarding FAPE and adequate policies, procedures, and programs (20 U.S.C. §§ 1401(9), 1412(a)(1)(A), 1413(a)(1), and 34 C.F.R. §§ 300.101, 300.201), and the provisions addressed in paragraph 247 above that integrate Delaware law into the IDEA (*see* 20 U.S.C. §§ 1401(9)(B), 1413(a)(1), 1415(a); 34 C.F.R. § 300.201), as well as Delaware law, including 14 *Del.C.* §§ 3101(5) (FAPE) and 3120 (right to receive public education), and 14 Del. Admin. C. §§ 922.1.0 (purposes of Children with Disabilities provisions), 924.1.2 (consistency with state policies), and 926.30.0 (discipline procedures authority of school personnel).

## Count 1F
### Deprivation of FAPE by Failing to Perform Timely Annual IEP Reviews

252. As described above (including in paras. 22-32, 46, 98, 133, 226-227), APER fails to perform annual IEP reviews. APER's failures are numerous and systemic and deprive students of FAPE. APER and Ms. Forde-Whelan have violated and continue to violate numerous provisions of the IDEA including 20 U.S.C. § 1414(d)(4) (review and revision of IEP), and related federal regulations including 34 C.F.R. § 300.324(b) (review and revision of IEPs), the provisions addressed in paragraph 247 above regarding FAPE and adequate policies, procedures, and programs (20 U.S.C. §§ 1401(9), 1412(a)(1)(A), 1413(a)(1) and 34 C.F.R. §§ 300.101, 300.201), and the provisions addressed in paragraph 247 above that integrate Delaware law into the IDEA (*see* 20 U.S.C. §§ 1401(9)(B), 1413(a)(1), 1415(a); 34 C.F.R. § 300.201), as well as Delaware law, including 14 *Del.C.* §§ 3101(5) (FAPE) and 3120 (right to receive public education), and 14 Del. Admin. C. §§ 922.1.0 (purposes of Children with Disabilities provisions), 924.1.2 (consistency with state policies), and 925.11.0 (development, review, and revision of IEP).

**Count 1G**
**Deprivation of FAPE by Failing to Timely Reevaluate Students**

253. As described above (including in paras. 22-32, 46, 74, 98, 133, 142), APER fails to timely reevaluate students.  APER's failures are numerous and systemic and deprive students of FAPE.  APER and Ms. Forde-Whelan have violated and continue to violate numerous provisions of the IDEA including 20 U.S.C. § 1414(a)(2) (reevaluations), and related federal regulations including 34 C.F.R. § 300.303 (reevaluations), the provisions addressed in paragraph 247 above regarding FAPE and adequate policies, procedures, and programs (20 U.S.C. §§ 1401(9), 1412(a)(1)(A), 1413(a)(1) and 34 C.F.R. §§ 300.101, 300.201), and the provisions addressed in paragraph 247 above that integrate Delaware law into the IDEA (*see* 20 U.S.C. §§ 1401(9)(B), 1413(a)(1), 1415(a); 34 C.F.R. § 300.201), as well as Delaware law, including 14 *Del.C.* §§ 3101(5) (FAPE) and 3120 (right to receive public education), and 14 Del. Admin. C. §§ 922.1.0 (purposes of Children with Disabilities provisions), 924.1.2 (consistency with state policies), 925.3.0 (reevaluations), 925.4.0 (evaluation procedures), and 925.5.0 (additional requirements for evaluations and reevaluations).

**Count 1H**
**Deprivation of FAPE by Failing to Comply with Other Procedural**
**Requirements Necessary to Involve Students, Their Parents,**
**and Their Counsel in Their Education**

254. As described above (including in paras. 22-32, 49, 74, 99, 139-143, 179, 182-186, 227-231, 235(e)-(f), (m)), APER fails to comply with numerous other procedural requirements necessary to involve students, their parents, and their counsel in their education.  APER's failures are numerous and systemic and deprive students of FAPE.  APER and Ms. Forde-Whelan have violated and continue to violate numerous provisions of the IDEA including 20 U.S.C. §§ 1412(a)(6)(A) (procedural safeguards), 1414(a)(1)(D) (parental consent), 1414(b)(1) (notice regarding evaluation procedures), 1414(b)(4)(B) (determination to be provided to parent),

1414(c)(3) (parental consent), 1414(c)(4)(A) (notification due to parent if additional data are not needed), 1414(d)(1)(B) (IEP Team), 1414(d)(3)(A) (IEP Team shall consider parental concerns), 1414(e) (parents part of educational placement decisions), and 1415(a)–(d) (procedural safeguards), and related federal regulations including 34 C.F.R. §§ 300.121 (procedural safeguards), 300.300 (parental consent), 300.321(IEP Team), 300.322 (parent participation), 300.501 (opportunity to examine records; parent participation in meetings), 300.503 (prior written notice), 300.504 (procedural safeguards notice), and 300.613 (parental access to records), the provisions addressed in paragraph 247 above regarding FAPE and adequate policies, procedures, and programs (20 U.S.C. §§ 1401(9), 1412(a)(1)(A), 1413(a)(1) and 34 C.F.R. §§ 300.101, 300.201), and the provisions addressed in paragraph 247 above that integrate Delaware law into the IDEA (*see* 20 U.S.C. §§ 1401(9)(B), 1413(a)(1), 1415(a); 34 C.F.R. § 300.201), as well as Delaware law, including 14 *Del.C.* §§ 3101(5) (FAPE), 3120 (right to receive public education), 3130 (opportunity to access and receive copies of educational records), 3132 (educational surrogate parents and educational representatives), 3133 (notice required), and 3134 (contents of notice), and 14 Del. Admin. C. §§ 922.1.0 (purposes of Children with Disabilities provisions), 923.21.0 (procedural safeguards), 923.50.0 (implementation of procedural safeguards), 924.1.2 (consistency with state policies), 925.1.0 (parental consent), 925.8.0 (IEP Team), 925.9.0 (parent participation), 926.1.0 (general procedural safeguards and opportunity to examine and obtain copies of records and observe educational programs), 926.3.0 (prior notice by the public agency: content of notice), 926.4.0 (procedural safeguards notice), 926.20.0 (transfer of parental rights at age of majority), and 927.13.0 (right to access educational records).

**COUNTS 2A THROUGH 2H: VIOLATION OF THE IDEA AND DELAWARE LAW**
(AGAINST DEFENDANTS DDOE AND SECRETARY HOLODICK)

255. Plaintiffs incorporate by reference each and every allegation above as if specifically set forth herein.

**Count 2A**
**Deprivation of FAPE by Failing to Ensure that APER Provides Education and Services and Develops IEPs Upon School Transfers**

256. As described in Count 1A above, upon school transfers, including those resulting from a student's entry into a Delaware correctional facility, APER fails to provide FAPE, including services comparable to those described in previous IEPs, and fails to develop, adopt, and implement IEPs.  DDOE is responsible for ensuring that APER fulfills its obligations but has failed to do so (*see* paras. 33, 237 above).  DDOE's failures are numerous and systemic and deprive students of FAPE.  DDOE and Secretary Holodick have violated and continue to violate numerous provisions of the IDEA including all of the provisions referenced in Count 1A, as well as 20 U.S.C. §§ 1412(a)(11) (SEA responsible for general supervision) and 1416 (monitoring, technical assistance, and enforcement); 34 C.F.R. §§ 300.149 (SEA responsibility for general supervision) and 300.600 (state monitoring and enforcement); 14 *Del.C.* §§ 121(a)(1), (10) (general powers of DDOE, including developing and executing policies and laws and conducting investigations and providing for the enforcement or compliance with federal legal requirements); and 14 Del. Admin. C. §§ 923.20.0 (monitoring activities), 927.1.0 (general monitoring and priority areas), 927.2.2 (DDOE public reporting of LEA performance), and 927.3.0 (DDOE's review and determination regarding LEA performance).

**Count 2B**
**Deprivation of FAPE by Failing to Ensure that APER Timely and Adequately Evaluates**
**Students with Disabilities Based on their Individual Needs**

257. As described in Count 1B above, APER fails to timely and adequately evaluate students with disabilities based on their individual needs. DDOE is responsible for ensuring that APER fulfills its obligations but has failed to do so. DDOE's failures are numerous and systemic and deprive students of FAPE. DDOE and Secretary Holodick have violated and continue to violate numerous provisions of the IDEA including all of the provisions referenced in Count 1B, as well as 20 U.S.C. § 1412(a)(11) (SEA responsible for general supervision) and 1416 (monitoring, technical assistance, and enforcement); 34 C.F.R. §§ 300.149 (SEA responsibility for general supervision) and 300.600 (state monitoring and enforcement); and 14 Del. Admin. C. §§ 923.20.0 (monitoring activities), 927.1.0 (general monitoring and priority areas), 927.2.2 (DDOE public reporting of LEA performance), and 927.3.0 (DDOE's review and determination regarding LEA performance).

**Count 2C**
**Deprivation of FAPE by Failing to Ensure that APER Timely Develops Appropriate IEPs**
**for Students with Disabilities Based on their Individual Needs**

258. As described in Count 1C above, APER fails to timely develop appropriate IEPs for students with disabilities based on their individual needs. DDOE is responsible for ensuring that APER fulfills its obligations but has failed to do so. DDOE's failures are numerous and systemic and deprive students of FAPE. DDOE and Secretary Holodick have violated and continue to violate numerous provisions of the IDEA including all of the provisions referenced in Count 1C, as well as 20 U.S.C. § 1412(a)(11) (SEA responsible for general supervision) and 1416 (monitoring, technical assistance, and enforcement); 34 C.F.R. §§ 300.120 (SEA monitoring regarding least restrictive environment), 300.149 (SEA responsibility for general supervision), and 300.600 (state monitoring and enforcement); and 14 Del. Admin. C. §§ 923.20.0 (monitoring

activities), 927.1.0 (general monitoring and priority areas), 927.2.2 (DDOE public reporting of LEA performance), and 927.3.0 (DDOE's review and determination regarding LEA performance).

**Count 2D**
**Deprivation of FAPE by Failing to Ensure that APER Implements IEPs as Required to Provide Needed Education and Services**

259. As described in Count 1D above, APER fails to implement IEPs as required and as needed to provide FAPE.  DDOE is responsible for ensuring that APER fulfills its obligations but has failed to do so.  DDOE's failures are numerous and systemic and deprive students of FAPE. DDOE and Secretary Holodick have violated and continue to violate numerous provisions of the IDEA including all of the provisions referenced in Count 1D, as well as 20 U.S.C. § 1412(a)(11) (SEA responsible for general supervision) and 1416 (monitoring, technical assistance, and enforcement); 34 C.F.R. §§ 300.120 (SEA monitoring regarding least restrictive environment), 300.149 (SEA responsibility for general supervision), and 300.600 (state monitoring and enforcement); and 14 Del. Admin. C. §§ 923.20.0 (monitoring activities), 927.1.0 (general monitoring and priority areas), 927.2.2 (DDOE public reporting of LEA performance), and 927.3.0 (DDOE's review and determination regarding LEA performance).

**Count 2E**
**Deprivation of FAPE by Failing to Ensure that APER Makes Manifestation Determinations and then Takes Required Follow-Up Action**

260. As described in Count 1E above, when students face a disciplinary change of placement, APER fails to make manifestation determinations and then take required follow-up action such as conduct a functional behavior assessment and develop a behavior support plan, which has the secondary effect of depriving students of special education as punishment.  DDOE is responsible for ensuring that APER fulfills its obligations but has failed to do so.  DDOE and Secretary Holodick have violated and continue to violate numerous provisions of the IDEA including all of the provisions referenced in Count 1E, as well as 20 U.S.C. § 1412(a)(11) (SEA

responsible for general supervision) and 1416 (monitoring, technical assistance, and enforcement); 34 C.F.R. §§ 300.149 (SEA responsibility for general supervision) and 300.600 (state monitoring and enforcement); and 14 Del. Admin. C. §§ 923.20.0 (monitoring activities), 927.1.0 (general monitoring and priority areas), 927.2.2 (DDOE public reporting of LEA performance), and 927.3.0 (DDOE's review and determination regarding LEA performance).

**Count 2F**
**Deprivation of FAPE by Failing to Ensure that APER Performs Annual IEP Reviews**

261. As described in Count 1F above, APER fails to perform annual IEP reviews. DDOE is responsible for ensuring that APER fulfills its obligations but has failed to do so. DDOE's failures are numerous and systemic and deprive students of FAPE. DDOE and Secretary Holodick have violated and continue to violate numerous provisions of the IDEA including all of the provisions referenced in Count 1F, as well as 20 U.S.C. § 1412(a)(11) (SEA responsible for general supervision) and 1416 (monitoring, technical assistance, and enforcement); 34 C.F.R. §§ 300.149 (SEA responsibility for general supervision) and 300.600 (state monitoring and enforcement); and 14 Del. Admin. C. §§ 923.20.0 (monitoring activities), 927.1.0 (general monitoring and priority areas), 927.2.2 (DDOE public reporting of LEA performance), and 927.3.0 (DDOE's review and determination regarding LEA performance).

**Count 2G**
**Deprivation of FAPE by Failing to Ensure that APER Timely Reevaluates Students**

262. As described in Count 1G above, APER fails to timely reevaluate students. DDOE is responsible for ensuring that APER fulfills its obligations but has failed to do so. DDOE's failures are numerous and systemic and deprive students of FAPE. DDOE and Secretary Holodick have violated and continue to violate numerous provisions of the IDEA including all of the provisions referenced in Count 1G, as well as 20 U.S.C. § 1412(a)(11) (SEA responsible for general supervision) and 1416 (monitoring, technical assistance, and enforcement); 34 C.F.R. §§ 300.149

(SEA responsibility for general supervision) and 300.600 (state monitoring and enforcement); and 14 Del. Admin. C. §§ 923.20.0 (monitoring activities), 927.1.0 (general monitoring and priority areas), 927.2.2 (DDOE public reporting of LEA performance), and 927.3.0 (DDOE's review and determination regarding LEA performance).

**Count 2H**
**Deprivation of FAPE by Failing to Ensure that APER Complies with Other Procedural**
**Requirements Necessary to Involve Students, Their Parents,**
**and Their Counsel in Their Education**

263. As described in Count 1H above, APER fails to comply with other procedural requirements necessary to involve students, their parents, and their counsel in their education. DDOE is responsible for ensuring that APER fulfills its obligations but has failed to do so. DDOE's failures are numerous and systemic and deprive students of FAPE. DDOE and Secretary Holodick have violated and continue to violate numerous provisions of the IDEA including all of the provisions referenced in Count 1H, as well as 20 U.S.C. § 1412(a)(11) (SEA responsible for general supervision) and 1416 (monitoring, technical assistance, and enforcement); 34 C.F.R. §§ 300.149 (SEA responsibility for general supervision) and 300.600 (state monitoring and enforcement); and 14 Del. Admin. C. §§ 923.20.0 (monitoring activities), 923.49.0 (DDOE responsibility for general supervision of procedural safeguards), 927.1.0 (general monitoring and priority areas), 927.2.2 (DDOE public reporting of LEA performance), and 927.3.0 (DDOE's review and determination regarding LEA performance).

**COUNT 3: VIOLATION OF THE REHABILITATION ACT**
(AGAINST DEFENDANTS APER, MS. FORDE-WHELAN,
DDOE, AND SECRETARY HOLODICK)

264. Plaintiffs incorporate by reference each and every allegation above as if specifically set forth herein.

265. As described above (paras. 51-55), Section 504 of the Rehabilitation Act (29 U.S.C. § 794(a)) and its implementing regulations forbid discrimination against or excluding an otherwise qualified person from participation in a federally funded program or activity because of the person's disability and also prohibit retaliation against students with disabilities for exercising their rights.

266. The students at issue in this case are otherwise qualified individuals under the Rehabilitation Act because they have a physical or mental impairment that substantially limits one or more major life activities including learning, concentrating, and thinking and are, will be, or were enrolled, and meet the essential eligibility requirements to be enrolled, in an educational program while incarcerated. 29 U.S.C. § 794(a) (cross-referencing 29 U.S.C. § 705(20), which cross-references 42 U.S.C. § 12102(1)); 42 U.S.C. § 12102(1) (defining "disability"); 34 C.F.R. § 104.3(l)(2) (defining "[q]ualified handicapped person").

267. Defendants are recipients of federal funding and operate a public secondary education program.

268. In the myriad ways described above, Defendants have discriminated against and continue to discriminate against students with disabilities solely because of their disabilities by failing, over many years, to provide them with the opportunity to participate in or benefit from education.

269. Furthermore, as described above (paras. 139, 178, 183-184, 194), Defendants have retaliated against students who have asserted their educational rights.

270. Defendants' actions have grossly departed from federal and state law as summarized herein, and they have exercised gross misjudgment, have grossly departed from acceptable

standards among educational professionals, have demonstrated bad faith, and have intentionally discriminated against students with disabilities.

### COUNT 4: VIOLATION OF THE ADA
(AGAINST DEFENDANTS APER, MS. FORDE-WHELAN,
DDOE, AND SECRETARY HOLODICK)

271. Plaintiffs incorporate by reference each and every allegation above as if specifically set forth herein.

272. As described above (paras. 56-59), the ADA and its implementing regulations prohibit discrimination by public entities against qualified individuals with disabilities and also prohibit retaliation against students with disabilities for exercising their rights.

273. Defendants are public entities responsible for administering and/or providing education to students with disabilities.

274. The students with disabilities are qualified individuals under the ADA because they have a physical or mental impairment that substantially limits one or more major life activities including learning, concentrating, and thinking, and are, will be, or were enrolled, and meet the essential eligibility requirements to be enrolled, in Defendants' educational program.  42 U.S.C. § 12131(2) (defining "qualified individual with a disability"); 42 U.S.C. § 12102(1) (defining "disability").

275. For all of the reasons described above, Defendants' actions and inactions violate the ADA and its implementing regulations.

### VII

### RELIEF

276. Plaintiffs request that this Court grant the following relief:

(a)     A declaratory judgment pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure that Defendants have violated the statutes and regulations described herein;

(b)     A preliminary and permanent injunction ordering Defendants to develop and implement adequate and effective policies and procedures to provide FAPE to all eligible students regardless of their housing location, to ensure that students are provided FAPE, including by addressing all issues described in Counts 1 through 4 above, and to ensure that students do not suffer from discrimination or retaliation;

(c)     An order requiring appropriate monitoring and reporting by Defendants to the Court and Plaintiff on the status of compliance;

(d)     An order appointing a Special Master whose duties shall include, but not be limited to, monitoring and reporting to the Court regarding Defendants' compliance or lack thereof with the Court's order and remedies necessary to bring about full compliance with the Court's order;

(e)     Retention of jurisdiction over this action to ensure Defendants' compliance with the Court's orders;

(f)     An award of litigation costs, including attorneys' fees, expert expenses, and other costs pursuant to 20 U.S.C. § 1415(i)(3)(B), 29 U.S.C. § 794a(b), 42 U.S.C. § 12205, and 14 Del. Admin. C. § 926.17.0; and

(g)     Such other relief as may be deemed proper by the Court.

Respectfully submitted,

/s/ Marissa L. Band

KATHLEEN L. MILLIAN*
ZENIA SANCHEZ FUENTES*
TODD A. GLUCKMAN*
MICHAEL L. HUANG*
TERRIS, PRAVLIK & MILLIAN, LLP
1816 12th Street, N.W., Suite 303
Washington, DC 20009
(202) 682-2100
kmillian@tpmlaw.com
zsanchez@tpmlaw.com
tgluckman@tpmlaw.com
mhuang@tpmlaw.com

*Application for admission pro hac vice
to be filed on May 23, 2024

RICHARD H. MORSE (Del. Bar No. 531)
MARISSA L. BAND (Del. Bar No. 5131)
VICTORIA GLOCK-MOLLOY
  (Del. Bar No. 6806)
STEFANIE N. RAMIREZ
  (Del. Bar. No. 6898)
COMMUNITY LEGAL AID
  SOCIETY, INC.
100 West 10th Street, Suite 801
Wilmington, DE 19801
Telephone: (302) 575-0660, Ext. 228
Facsimile: (302) 575-0840
rmorse@declasi.org
mband@declasi.org
vglock-molloy@declasi.org
sramirez@declasi.org

May 23, 2024

*Counsel for Plaintiff*

97